## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON

**ROGER LEE HARPER,**

　　　**Petitioner,**

**v.**                                          **Case No. 2:13-cv-07421**

**DAVID BALLARD, Warden,**
**Mount Olive Correctional Complex,**

　　　**Respondent.**

### PROPOSED FINDINGS AND RECOMMENDATION

On April 8, 2013, Roger Lee Harper (hereinafter "Harper" or "the petitioner"), an inmate at the Mount Olive Correctional Complex, filed his initial Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 2). In a Memorandum Opinion and Order (ECF No. 23) entered on February 12, 2014, the petitioner was granted leave to file an Amended Petition, expanding his grounds for habeas corpus relief to include cognizable federal constitutional claims that were exhausted in his direct appeal. The Amended Petition (ECF No. 24) was filed on March 10, 2014.

This matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B). Pending before the court are the respondent's Motion for Summary Judgment (ECF No. 31), and the petitioner's Motion to Deny Respondent's Motion to Dismiss pursuant to Rule 12(b)(6) (ECF No. 34).

## PROCEDURAL HISTORY OF PETITIONER'S CASE

On October 15, 1991, the petitioner was convicted by a jury in the Circuit Court of Roane County, West Virginia, on two counts of first degree murder and one count of malicious wounding.  *State v. Harper*, No. 90-F-8 (Cir. Ct. Roane Cty, Oct. 15, 1991). (ECF No. 12, Ex. 1-3).  On November 4, 1991, the petitioner was sentenced to life without mercy on each of the first degree murder counts, and a concurrent sentence of two to ten years on the malicious wounding count.  (*Id.*, Ex. 3).

 The petitioner's convictions stem from a November 24, 1989 incident at a bar in Spencer, West Virginia, in which the petitioner shot and killed two people and wounded another in front of a room full of people.  The petitioner has never denied shooting the victims, but claims that he has no memory of doing so.  In his post-conviction proceedings, the petitioner has argued that he was denied the ability to present a defense concerning an alleged mental condition, Intermittent Explosive Disorder ("IED"), which he asserts would support a diminished capacity defense and negate the intent element required for a first degree murder conviction.  The petitioner also alleges violations of his constitutional rights based upon ineffective assistance of counsel, prosecutorial misconduct, instructional error, and juror bias.

On April 8, 2013, the petitioner filed his initial section 2254 petition, which contained four overarching grounds for relief, including nine sub-claims of ineffective assistance of counsel.  (ECF No. 2)  On January 21, 2014, the undersigned submitted a Proposed Findings and Recommendation ("PF&R") recommending that the presiding District Judge deny, without prejudice, a prior Motion for Summary Judgment filed by the respondent, and grant leave to the petitioner to file an Amended Petition setting

forth eight additional grounds for relief that were exhausted through the petitioner's direct appeal. (ECF No. 22).

The PF&R, however, did not make any specific findings and recommendations about the exhaustion of the claims raised in the initial section 2254 petition; rather, it only focused on what claims the petitioner could potentially add in his Amended Petition. On February 12, 2014, the presiding District Judge adopted the undersigned's PF&R, denied the pending Motion for Summary Judgment, and granted the petitioner leave to file an Amended Petition to include the eight grounds for relief from his direct appeal. (ECF No. 23).

On March 10, 2014, the petitioner filed his Amended Petition, which sets forth the following grounds for relief:

1. Petitioner was denied his opportunity to present a complete defense when the trial court denied an indigent defendant's reasonable choice of a defense mental expert when the state had access to use of an expert and also the trial court erred in denying the defendant's motion for additional fees to retain Dr. Russell R. Monroe after defense expert Dr. Ralph Smith testified that he subjectively did not believe that the mental condition defendant was provisionally diagnosed to suffer from was an actual mental condition or disease that existed at all.

2. Petitioner was denied his right to effective and meaningful assistance of counsel by his acts of omission and acts of commission during the petitioner's pre-trial, trial and sentencing.

   a. Counsel failed to move to dismiss the indictment because it failed to include essential elements of murder in the first degree.

   b. Counsel failed to attack validity of the indictment because the prosecutor offered unsworn testimony before the grand jury on January 24, 1990.

   c. Counsel failed to move for a change of venue due to pre-trial publicity.

      d.     Counsel failed to *voir dire* jury regarding the impact of Killeen, Texas murders.

      e.     Counsel failed to investigate and develop or present a diminished capacity defense.

      f.     Counsel failed to move to suppress inculpatory statements made by the petitioner.

      g.     Counsel failed to properly investigate the case and discuss probable strategy and tactics with the petitioner.

      h.     Counsel failed to call defense witnesses to rebut the State's testimony and to offer evidence on provocation and self-defense.

      i.     Counsel failed to prepare proper jury instructions and to object to instruction on inference of malice.

      j.     Counsel failed to raise important legal issues in direct appeal.

      k.     Counsel failed to ascertain Dr. Ralph Smith's opinion prior to offering his expert testimony.

      l.     Counsel failed to introduce prior written statement of Connie Nichols.

      m.     Counsel failed to timely object to prosecutor's improper rebuttal argument and failed to request a mistrial.

3.     Petitioner was denied a fair and impartial trial when he was denied a change of venue due to extensive pretrial publicity and the trial court permitted biased jurors to sit on the petitioner's jury.

4.     Petitioner was denied a fair and impartial jury trial when the trial court failed to provide the jury with complete and accurate instructions as to the law applicable to this case.

5.     Petitioner was denied a fair trial when the special prosecuting attorney took his oath of office before the Circuit Clerk prior to the entry of an order of appointment; therefore his participation in the case was improper.

6.      Petitioner was denied effective confrontation and full cross-examination of Melinda Stewart and Connie Nichols.

7.      Petitioner was denied a fair trial when the trial court refused to allow the defense to introduce evidence concerning allegedly exculpatory statements made by the petitioner at the time of his arrest.

8.      Petitioner was denied a fair trial based on improper and prejudicial comments made by the prosecuting attorney in closing arguments.

9.      Petitioner was denied a fair trial based upon cumulative errors.

10.     Petitioner was denied due process of law and equal protection of the laws when, because of the petitioner's indigence, the trial court denied the petitioner a reasonable choice of a defense mental health expert, when the State had access to the use of an expert and also the trial court erred in denying the defendant's motion for additional fees to retain Dr. Russell R. Monroe after defense expert Dr. Ralph Smith testified that he subjectively did not believe that the mental condition defendant was provisionally diagnosed to suffer from was an actual mental condition or disease that existed at all.

(ECF No. 24).

On June 16, 2014, the respondent filed a Motion for Summary Judgment (ECF No. 31) and a Memorandum of Law in support thereof.  (ECF No. 32).[1]  In the "Standard of Review" section of his Memorandum of Law in support of his Motion for Summary Judgment (ECF No. 32 at 7-9), the respondent also includes a section entitled "Motion to Dismiss for Failure to State a Claim," setting forth the standard for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and stating that any claims which are not of a constitutional dimension or do not sufficiently state cognizable federal constitutional claims should be dismissed.

---

[1] The respondent incorporates by reference the exhibits he submitted in support of his prior Motion for Summary Judgment, which are located in ECF No. 12.  Thus, when citing to the respondent's exhibits, the undersigned will refer to ECF No. 12.

On June 18, 2014, in accordance with the holding of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the undersigned entered an Order and Notice (ECF No. 33), notifying the petitioner of his right and obligation to respond to the respondent's Motion for Summary Judgment, and setting deadlines of July 30, 2014 for the petitioner's response, and August 13, 2014 for respondent's reply.

On June 20, 2014, the petitioner filed a Motion to Deny Respondent's Motion to Dismiss Pursuant to Rule 12(b)(6) (ECF No. 34), contending that, generally, Rule 12(b)(6) motions are inappropriate in the habeas context.  The Motion to Deny also asserts that, because the undersigned ordered that the petitioner could proceed on an Amended Petition and made prior findings that certain claims alleged in the direct appeal were cognizable federal constitutional claims, and then ordered the respondent to respond to the Amended Petition, a Rule 12(b)(6) motion is not appropriate in this case.

On July 21, 2014, the petitioner filed a Reply to Respondent's Motion for Summary Judgment (hereinafter "the petitioner's Response").  (ECF No. 38).  On August 7, 2014, the respondent filed a Reply.  (ECF No. 40).  This matter is ripe for adjudication.

## STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000), the Supreme Court held that under the "contrary to" clause, a federal court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the state court decides a case differently from the Supreme Court on a set of materially indistinguishable facts. The Court further held that under the "unreasonable application" test, a federal court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court only if the state court identifies the correct governing principle from the Supreme Court's decision, but unreasonably applies that principle to the facts of the prisoner's case. *Id.* at 413.

Moreover, the AEDPA contains a presumption that a state court's factual findings are correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Where a claim has been summarily refused, the undersigned must simply determine whether that decision was legally and factually reasonable under clearly-established federal law. *See Bell v. Jarvis*, 236 F.3d 149, 158 (4th Cir. 2000) (When a

state court summarily rejects a claim without setting forth its reasoning, the federal court reviews the record and the clearly-established Supreme Court law, but still "confine[s] [its] review to whether the court's determination 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.'").

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings. *See*, *e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 81 (1977); *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991). Entry of summary judgment is appropriate when there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.).

## FACTUAL BACKGROUND AND RELEVANT TESTIMONY

On November 24, 1989, John Channels, Jr. and Charles Tanner were shot and killed and Ivan Wise sustained two gunshot wounds at the Bargain Basement bar in Spencer, West Virginia. Numerous eyewitnesses testified that Harper was the shooter, and that fact appears to be undisputed. The testimony at trial revealed the following:

Harper arrived at the Bargain Basement with his ex-girlfriend, Melinda Stewart. (ECF No. 12, Ex. 34 at 44). Stewart's sister, Connie Nichols, was also at the bar. At one point, Stewart sat down at a booth with a group of people, including Tanner, Channels and Wise, whom Harper had not met before that night. (*Id.* at 44, 62-63).

Nichols testified that she had been talking to Harper for about five minutes and said he seemed upset and made the comment "I about had enough," while looking back towards the table where Stewart and the others were gathered. (*Id.* at 10-11). Nichols further testified that she went back and told her sister that she needed to talk to Harper.

Stewart allegedly told her they already had a talk and had decided to be friends.  (*Id.* at 12).  Then, Nichols went back and asked Harper to dance.  (*Id.*)

According to Nichols, while she and Harper were dancing, Tanner passed by and tapped Harper on the shoulder, and Harper turned around and swung at Tanner.  (*Id.* at 12-13, 62-63).  Nichols grabbed Harper's arm and said "leave him alone, that he didn't mean nothing by it."  (*Id.* at 13-14).  Tanner then walked back to the booth where some of the other people, including Stewart, Channels and Wise, were gathered.  According to Jerry Cottrell, who was also at the booth, when Tanner got to the table, he said, "Did you see that?  He hit me."  (ECF No. 12, Ex. 33 at 57, 59).

Cottrell testified that Tanner's statement made everyone laugh, which apparently drew Harper's attention.  Cottrell told the police that he heard Harper say "they're pissing me off."  (*Id.* at 70).  Harper then turned towards the table where the others were gathered.  (*Id.* at 61-62).

Stewart testified that there was a commotion on the dance floor and she heard Nichols "cussing" Tanner.  Stewart said she hollered at Tanner and told him to come over.  She then said Tanner told them Harper had hit him in the jaw because he tapped him on the shoulder.  (ECF No. 12, Ex. 34 at 46-47).  Stewart stated that she handed Tanner a beer and told him to forget about it.  (*Id.* at 47).  Stewart further stated that Wise said something to Tanner and that is when she heard Nichols scream and saw Harper out of the corner of her eye coming towards the table.  (*Id.*)

Stewart said she thought that Harper was going to hit Tanner, so she started towards them, but Channels stepped in front of her to put his beer on the table and blocked her.  Then she heard a shot ring out and she got shoved into the booth.  (*Id.* at 48).  Cottrell testified that he was about three feet away from Harper and heard a click

and a sound like a firecracker and saw a flash of gunpowder coming out of the barrel of a gun.  (ECF No. 12, Ex. 33 at 63, 70).  Channels and Tanner both fell to the floor.  (ECF No. 12, Ex. 34 at 16).

As Wise was running for the doorway between the front and back rooms of the bar, Harper grabbed him by the back of his jacket, stuck the gun up to his back and shot him twice.  (ECF No. 12, Ex,. 33 at 82; ECF No. 12, Ex. 34 at 87).[2]   Stewart testified that she asked Harper what he was doing and he said "I've got to get the hell out of here." (*Id.* at 50; ECF No. 12, Ex. 33 at 206).  Then, he went and grabbed his coat and walked out of the bar.  (ECF No. 12, Ex. 34 at 50).  Several other patrons testified that Harper had a gun in his hand.  Stewart followed him outside, but returned to check on the victims.  (ECF No. 12, Ex. 34 at 50-51).

The petitioner testified at trial.  He stated that he had no memory of the shootings or what he did for most of the remainder of that night.  He stated that he remembered that Tanner tapped him on the shoulder, and he hit Tanner for trying to cut in on him and his dance partner.  He said he apologized to Tanner and felt no ill will, anger or jealousy, and felt the issue was over.  (ECF No. 12, Ex. 34 at 162-166).  He further stated that the last thing he remembered was Tanner pointing his finger at him and Nichols, and then Tanner had his hands on his jacket like he was taking it off.  (*Id.* at 166-169).

He testified that he has no other memory of that night until he suddenly came to in his car, which was on a dirt or gravel road.  At that point, he still had the gun in his hand.  (*Id.* at 169).  The petitioner further testified that he blacked out again, and the

---

[2]  Gun powder residue on the clothing of the victims indicated that all of the victims were shot at close range.  (ECF No. 12, Ex. 33 at 102).

next thing he remembered, he was at the mouth of Harmony Road at the Harmony Post Office, and no longer had the gun, which was never found. (*Id.* at 169-170).

Despite allegedly having no memory of what happened, the petitioner called his sister to ask her if she had heard anything about him doing something bad. At first she said no, but when the petitioner called her a second time, she informed him that the State Police were at her house looking for him. (*Id.* at 171). The petitioner contacted State Trooper H.M. Eads the following morning and turned himself in. (*Id.* at 172).

The petitioner was questioned by Sgt. Eads, who asked him if he carried a gun. (*Id.* at 174). The petitioner replied that he had a five-shot revolver. (*Id.*) The petitioner stated that Eads asked him other questions, but, at trial, he could not recall what was asked. The petitioner said he told Eads he wanted to talk to a lawyer, and they took him down to be booked. (*Id.*) The petitioner also testified that he regularly carried a gun because he had been shot at by an unknown assailant a short time before this incident. (*Id.* at 176).    He presented another witness to confirm that fact. (*Id.* at 208-210). The petitioner further contended that alcohol played no part in this incident. (*Id.* at 201).

Sgt. Eads was called as a prosecution witness. During his cross-examination, Eads stated that the petitioner arrived at the detachment and said "he was in a lot of trouble and he'd done something bad." (ECF No. 12, Ex. 33 at 132). Defense counsel then wished to question Eads about some notes he made on the back of the waiver of rights form that was executed by the petitioner when he was arrested (which was marked as Defendant's Exhibit No. 4). The defense contended the notes contained statements made by the petitioner which were exculpatory in nature to the extent that the petitioner stated, at that time, that he had no memory of the incident. (ECF No. 12,

Ex. 33 at 134-135).  In essence, the defense wished to bolster the petitioner's subsequent testimony in support of his "no-memory" defense.

In an *in camera* hearing, the prosecutor asserted that this "statement" was hearsay, and the defense argued for its admission as a statement against interest.  (ECF No. 134-143).  The trial court made the following preliminary finding:

> This is not admissible.  It's not admissible by the State and it's not admissible for you gentlemen.  You're not offering anything here that you think is going to harm your client.  You're only offering this because you think it's going to help your client and a statement made of that nature is subject to the hearsay exception.
>
> * * *
>
> In any event, what's marked for identification purposes as Defendant's Exhibit No. 4, with the notes on the back of it; "5-shot revolver, 22 caliber, subject tapped on shoulder and accused went blank, rode around, pistol gone, don't know what happened to pistol."  That's all inadmissible.  That's not going to be admitted.  That statement, "he was in a lot of trouble and had done something bad."  The first thought is that the jury should be instructed to disregard this statement that he was in a lot of trouble and he had done something bad.

(*Id.* at 143-144).  The trial court then heard *in camera* testimony from Sgt. Eads concerning whether and when he advised the petitioner of his rights and when the petitioner asked for a lawyer.  Eads gave detailed testimony concerning his taking of this "statement" from the petitioner.  (*Id.* at 144-150).

The trial court confirmed his prior ruling that this evidence was not admissible and that he would instruct the jury to disregard Sgt. Eads' comment that the petitioner had said he was in a lot of trouble and had done something bad.  That instruction was given on the record at the conclusion of the *in camera* hearing.  (*Id.* at 153-154, 161). The court subsequently permitted defense counsel to vouch the record, outside the presence of the jury, with Sgt. Eads' testimony about the statements made by the

petitioner which were excluded.  (*Id.* at 175-178).  Eads testified that he asked the petitioner about what happened at the Basement Bar and the petitioner replied that the last thing he remembered was someone tapped him on the shoulder.  When asked what he did between the shootings and calling Sgt. Eads, the petitioner told Eads that he guessed he had driven around all night.  Sgt. Eads asked petitioner what happened to the pistol and the petitioner told him that it was gone and he didn't know what happened to it.  (*Id.*)

## ANALYSIS

### A.      Exhaustion of State Court Remedies.

Because the court's prior orders did not make any specific findings concerning the exhaustion of the claims raised in the petitioner's initial section 2254 petition, the undersigned finds it necessary to make the following findings about whether the ten grounds for relief contained in the petitioner's Amended Petition are sufficiently exhausted.[3]  The undersigned proposes that the presiding District Judge **FIND** as follows:

### *Grounds 1 and 10*

Grounds 1 and 10 of the Amended Petition, which contain the petitioner's claims concerning the denial of a mental expert, were exhausted through both the petitioner's direct appeal and his state habeas corpus proceedings.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that these claims have been properly exhausted and may be reviewed by this federal court under 28 U.S.C. § 2254.

---

[3]  The undersigned extensively addressed the procedural history of the petitioner's state court post-conviction filings in his prior PF&R, and believes it is unnecessary to repeat such procedural history herein.

### *Ground 2*

Ground 2 of the Amended Petition contains 13 claims of ineffective assistance of counsel.   Of those 13 claims, grounds 2(d), 2(k), 2(l) and 2(m) were pled in the petitioner's direct appeal.   Although the SCAWV generally does not consider claims of ineffective assistance of counsel on direct review, the SCAWV issued a summary refusal order on the petitioner's Petition for Appeal which contained these four claims of ineffective assistance of counsel, which satisfies the exhaustion requirement under section 2254(b)(1).   Furthermore, as asserted by the petitioner, this court previously found that these grounds stated cognizable federal constitutional claims which were exhausted through the direct appeal.   Moreover, pursuant to 28 U.S.C. § 2254(b)(2), the court may deny a claim for habeas corpus relief on the merits, notwithstanding the failure to exhaust state court remedies.   Thus, the undersigned will address the merits of these four specific claims of ineffective assistance of counsel.

However, the other nine claims of ineffective assistance of counsel raised in the petitioner's Amended Petition [grounds 2(a), 2(b), 2(c), 2(e), 2(f), 2(g), 2(h), 2(i) and 2(j)] were not raised by the petitioner or addressed by the state courts in either the petitioner's direct appeal or in his state habeas corpus proceedings.   Although the petitioner filed a *pro se* habeas corpus petition (08-C-62) on October 1, 2008, which raised some of these claims of ineffective assistance of counsel, and that petition was consolidated with his amended petition filed by counsel, Dennis Curry, in 93-C-147, it appears that the petitioner ultimately waived all other grounds for habeas corpus relief except for those concerning the denial of his mental health expert witness.

In fact, Judge Nibert made the following findings in his Final Order denying the petitioner habeas corpus relief:

> [O]n October 1, 2008, Dennis H. Curry filed a motion to be relieved as counsel for the reason that Mr. Curry was of the opinion that the only viable ground was the trial court's denial of an expert.  The Court had directed Mr. Harper to execute an omnibus habeas corpus checklist waiving other grounds not asserted in the Petition filed by Mr. Curry.  Petitioner thereafter filed a Petition asserting a laundry list of grounds.  This petition was assigned case number 08-C-62 by the clerk.  Subsequently, Petitioner, by letter dated October 4, 2008, indicated he misunderstood Mr. Curry's directions, desired to retain Mr. Curry as counsel, and would proceed as Mr. Curry sees fit.  Petitioner indicated he did not desire to waste Mr. Curry's time or the Court's time with issues without merit.  This Court considered Petitioner's letter of October 4, 2008 (in Case No. 08-C-62) as a waiver of other grounds for habeas corpus.

(ECF No. 12, Ex. 18 at 5-6).  The Final Order further states ". . .  noting the Petitioner's Waiver of Grounds for Post Conviction Habeas Corpus Relief not asserted in his Amended Petition, the Court is of the opinion to, and hereby does, Deny the Amended Petition for Post-Conviction Habeas Corpus Relief for the reasons contained in the opinion below."  (*Id.* at 1).  The Final Order only addressed the claims concerning the denial of the petitioner's expert witness.

Thus, the undersigned proposes that the presiding District Judge **FIND** that Grounds 2(a), 2(b), 2(c), 2(e), 2(f), 2(g), 2(h), 2(i) and 2(j) are unexhausted and procedurally defaulted and are not proper for this court's review under 28 U.S.C. § 2254.

<u>Ground 3</u>

Ground 3 of the petitioner's Amended Petition addresses claims concerning alleged juror bias and the denial of a change of venue based upon pre-trial publicity that were addressed, if at all, as claims of trial court error in the petitioner's direct appeal, and, as noted above, were not ultimately addressed in the petitioner's state habeas proceedings.  Accordingly, the petitioner has not fully and fairly presented these claims to the state court in the vein of federal constitutional violations.  Accordingly, the

undersigned proposes that the presiding District Judge **FIND** that these claims are unexhausted and procedurally defaulted and are not proper for this court's review under 28 U.S.C. § 2254.

### Ground 4

In Ground 4 of his Amended Petition, the petitioner contends that he was denied a fair trial because the trial court failed to properly instruct the jury.  The respondent's Answer to the Amended Petition (ECF No. 30 at 2-3) incorporates by reference its prior Answer to the initial section 2254 petition (ECF No. 11 at 2-3), which asserted that this ground for relief was not fully exhausted.  However, the respondent's Memorandum of Law in support of his Motion for Summary Judgment (ECF No. 32 n.5) acknowledges that, liberally construed, this claim is comparable to the claims raised in Ground 15 of the petitioner's direct appeal, which this court's prior order found to state an exhausted cognizable federal constitutional claim.  The undersigned agrees.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Ground 4 of the petitioner's Amended Petition is exhausted and proper for review under 28 U.S.C. § 2254.

### Grounds 5 through 8

In his Answer to the Amended Petition (ECF No. 30), the respondent asserts that Grounds 5 through 8 of the petitioner's Amended Petition are unexhausted and/or procedurally defaulted, because he did not raise these claims in his state habeas corpus proceedings.  The undersigned notes that Grounds 5 through 8 do allege federal constitutional claims, and that those claims were raised in a similar manner in the petitioner's direct appeal.  Despite the fact that the SCAWV issued a summary refusal order, those grounds are considered to be exhausted for purposes of filing a section

2254 petition, and the prior order of this court found that those claims were exhausted. The undersigned will not revisit those findings. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Grounds 5 through 8 of the petitioner's Amended Petition are exhausted and proper for review under 28 U.S.C. § 2254.

<u>Ground 9</u>

In Ground 9 of his Amended Petition, the petitioner asserts that his right to a fair trial was denied due to cumulative errors of the trial court, the prosecutor, and defense counsel. The petitioner raised a similar claim in his direct appeal, and as further noted by the respondent in his Answer to the Amended Petition, "ground nine (9) could be asserted as having been exhausted as specific due process claims were exhausted within the habeas appeal." (ECF No. 30 at 3). Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Ground 9 of the petitioner's Amended Petition is colorably exhausted and may be reviewed by this court under 28 U.S.C. § 2254.

Thus, using the summary judgment standard, the undersigned will address the merits of the following grounds for relief *infra*: Grounds 1, 2(d), 2(k), 2(l) and 2(m), 4, 5, 6, 7, 8, 9 and 10. However, the undersigned proposes that the presiding District Judge **FIND** that grounds 2(a), 2(b), 2(c), 2(e), 2(f), 2(g), 2(h), 2(i), 2(j) and 3 are appropriate for dismissal for failure to state a claim upon which relief can be granted because they are unexhausted and/or procedurally defaulted. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the petitioner's Motion to Deny Respondent's Motion to Dismiss pursuant to Rule 12(b)(6) (ECF No. 34) should be denied.

**B.      Grounds 1 and 10 – Denial of complete defense.**

In Grounds 1 and 10 of his Amended Petition, the petitioner claims that he was denied the right to put forward a "complete defense" when the trial court would not appropriate additional funding to enable the petitioner to seek another mental health expert after the first expert retained by the defense testified that he could not support a finding that the petitioner suffered from Intermittent Explosive Disorder ("IED") which would negate the intent element of first degree murder.  The petitioner further contends that this decision by the trial court violated his rights to due process and equal protection because the petitioner was indigent.  (ECF No. 24 at 5-7, 22-24).

This claim for relief is the only claim that was addressed by the Circuit Court in the petitioner's state habeas corpus proceedings.  On January 28, 2010, Judge David W. Nibert issued a thorough opinion denying this claim for relief making the following pertinent findings of fact:

On November 30, 1989, counsel for the defendant filed a motion for psychological examination and a motion for employment of a psychological expert. (ECF No. 12, Ex. 18 at 8, ¶ 3).  On December 6, 1989, the trial court deferred ruling on the motion.  (*Id.*)     On January 25, 1990, the petitioner was committed to the forensic unit at the Weston State Hospital for evaluation by one or more psychiatrists and one psychologist to determine his competency to stand trial and his criminal responsibility. (*Id.*, ¶ 5).

On April 12, 1990, the trial court received a forensic evaluation report from Dr. H.C. Haynes, M.D., with the Department of Health and Human Resources, Division of Health.   Using the Diagnostic and Statistical Manual of the American Psychiatric Association (DSM-III R), Dr. Haynes found the petitioner competent to stand trial and

criminally responsible. (*Id.* at 6). Dr. Haynes further diagnosed the petitioner with alcohol abuse (305.00), but ruled out alcohol dependency (303.90). (*Id.*, ¶ 6).

On June 12, 1990, the trial court received a report from Dr. Robert J. Rush, Ph.D., a licensed psychologist. Dr. Rush provisionally diagnosed the petitioner with IED and alcohol abuse. (*Id.* at 8-9, ¶ 7). Dr. Rush wrote his diagnostic impressions as follows:

> An episode in which Mr. Harper exhibited aggression grossly out of proportion to the precipitating event led to the pending charges. This was apparently not the first incident in which the subject lost control of his emotions and lashed out in rage. It would appear that this rather controlled individual attempts to deal with his negative feelings by repressing them. That at times when these hostile emotions have built up, perhaps when his inhibitions were lowered by alcohol, he'd strike out in rage. He reported no memory of his actions during these aggressive outbursts. A provisional diagnosis of Intermittent Explosive Disorder will be offered. Although this diagnosis had been retained in the DSM III-R there are some questions as to whether there is a clinical syndrome characterized by episodic loss of control that is not symptomatic of another disorder. The most likely candidate in this case would be Alcohol Intoxication. The subject's alcohol use meets the criteria for a second diagnosis, Alcohol Abuse.

(*Id.*) Judge Nibert's Final Order further states:

> Defense counsel desired to explore Dr. Rush's provisional diagnosis of [IED]. Defense counsel communicated with Ralph Smith, Jr., M.D., of Charleston Psychiatric Group, Inc., regarding an evaluation and opinion on the provisional diagnosis of [IED] (Record Criminal Case 90-F-8, pages 574-577).

(*Id.* at 9, ¶ 7).

On January 17, 1991, Dr. Smith presented his diagnosis of Alcohol Abuse Disorder and Learning Disability. Dr. Smith further stated that, based upon telephone interviews with the petitioner's acquaintances, "There is strong evidence from people who knew him (ex-wife and employers) that Mr. Harper was suffering some type of depressive illness during the 6 to 8 months leading up to the shooting. Symptoms and

problems described by these people were not mentioned by Mr. Harper and neither did

he mention the heart condition that he has."  (*Id.* at 9-10, ¶ 8).

>    Dr. Smith described the defendant's account of the crime as follows:

>    "Mr. Harper stated that on 11/24/90 [sic; 11/24/89] he was 'down there dancing in the Basement Bar in Spencer.'  It was approximately 9 or 10 o'clock at night.  He was dancing with a woman, Connie Sue Rhodes Nichols, 'a guy tapped me on the shoulder, I turned and hit him, I'm jumpy.'  He was taking his jacket off the last I remember, until I was out riding around.  My gun was missing.  He said he had a .22 caliber five-shot revolver which he had carried since August when someone shot at him.  He had no gun permit.  'I called my sister, I knew something was wrong.'  She told him on his second call that a trooper was looking for him.  Mr. Harper called the trooper and told him 'I was in bad trouble, that I killed two people and wounded another.'  He told the trooper he would be there at 10 o'clock to give himself up and did so.

>    Mr. Harper stated he drank four to six beers at the most that night and earlier that day had smoked two joints of marijuana (approximately 11 o'clock in the morning).  He says he had only smoked marijuana five or six times in his life.  He had taken Melinda Stewart, a girl he was dating, with him to the bar.  He left his house at 2:30 to go to her mother's trailer and got to Spencer's [sic; Spencer?] at about 5 or 6 and spent a half hour in Heck's and then 6:30 to 7 started drinking.  He says he rarely gets drunk and was not so that night and had only been drunk two or three times in ten years.  He said he never knew the men that he allegedly killed and had never met them before.  However, he remembered meeting them and talking to them there although he can't remember much else about them.  He said nothing special was happening in his life at the time."

(ECF No. 12, Ex. 18 at 10, ¶ 9).

On February 14, 1991, defense counsel filed a motion for additional expert fees to

employ an expert in diagnosing IED, particularly Dr. Russell R. Monroe, M.D. [who was

located in Baltimore, Maryland].  (*Id.*, ¶ 10).

On March 4, 1991, Dr. Smith testified before the trial court.  He stated that the

diagnostic category of IED was controversial and that he doubted its existence.  (*Id.* at

13, ¶ 11).  Judge Nibert quoted portions of Dr. Smith's testimony in his Final Order.  The

most significant colloquy included the following:

Q.      [By Mr. Titus:] Dr. Smith, despite this doubt that you testified to as [IED] being in existence as a clinical syndrome, did you nevertheless consider it in your diagnosis of Roger Harper, in this particular case?

A.      Yes sir, I did.

Q.      Now, prior to your coming in contact with the attorneys, or Mr. Harper in this particular case[,] [w]ere you familiar with Dr. Russell Monroe's name or his work?

A.      No.

Q.      Were you furnished Dr. Monroe's work or certain samples of that, or any article about that by defense counsel in this case?

A.      Yes.

Q.      Did you review that prior to examining Mr. Harper?

A.      Yes.

Q.      Do you have an opinion with respect as to whether Mr. Harper was at occasions and times relevant, that is, -- and you're familiar that there are two different cases here, malicious wounding charge and then a malicious wounding and two murder charges?

A.      Yes, sir.

Q.      At those particular times, do you have an opinion as to whether Roger Harper was suffering from [IED]?

A.      I do.

Q.      What is that opinion?

A.      That he was not.

Q.      Is that to a reasonable degree of medical certainty?

A.      Yes.

Q.      Did you ever tell any of the lawyers, there have been previous lawyers in this case, Dr. Smith, that in your opinion, [IED], in sum and effect, if not outright quotable language, was never a viable defense that was available to a particular individuals of a Defendant in the criminal case?

* * *

A.    I told them I didn't think it was worth pursuing.

Q.    Was this a notion that you had or an opinion you had prior to examining Mr. Harper?

A.    No.

Q.    That you ruled it out.

A.    No.

Q.    Because of your personal philosophy or is this after you examined Mr. Harper and just found to a reasonable degree of medical certainty, that he was not suffering from that.

A.    That's correct.

Q.    Which one?

A.    The last part.  That he does not have this condition.  It's a very rare condition.  It's very difficult to meet the condition because of the exclusion criteria, and once he met those, and I didn't believe he was in that category, it was my opinion it was not worth pursuing any further.

(ECF No. 12, Ex. 18 at 11-13).  Dr. Smith further stated that this was a matter of professional responsibility, not personal opinion, and that he had answered similar questions from defense counsel who was very focused on the IED diagnosis.  (*Id.* at 13-14).

On April 18, 1991 the trial court denied the petitioner's motion for additional expert fees, finding that "defense counsel was looking for an expert that had the same view as counsel did in regard to the [IED] that said counsel alleges the defendant suffers from, and that said motion is both unreasonable and unnecessary."  (*Id.* at 15, ¶ 11).  The trial court stated that he believed the defense was "doctor shopping."  (ECF No. 12, Ex. 31 at 5).

The Amended Petition asserts that, on September 24, 1991, the defense abandoned its efforts to secure further evaluations of the petitioner, and on October 2, 1991, defense counsel announced that they would not pursue an insanity defense or a diminished capacity defense.  (ECF No. 24 at 7).  Judge Nibert's Final Order describes the evidence concerning the expert issue as follows:

> It appears from the record in this case that Mr. Harper was never diagnosed by any psychiatrist or psychologist with [IED].  Dr. Rush made a provisional diagnosis of [IED], indicating that by necessity one would have to rule out Alcohol Intoxication.  Dr. Ralph Smith, while being doubtful of the diagnosis of [IED], nevertheless proceeded to conduct an objective evaluation of the defendant according to his testimony.  Dr. Smith testified that he could not diagnose [IED] because he could not rule out the exclusion criteria which prohibit the diagnosis.  The defendant had secured the services of an expert and had had the benefit of the psychological and psychiatric evaluation of Charleston Psychiatric Group chosen by the defendant and his counsel.  The defendant and his attorney did not like the results of the evaluation and sought a psychologist in Baltimore, Maryland as an additional potential expert.

> The Court, after conducting an evidentiary hearing and evaluating the testimony of Dr. Smith, concluded that Dr. Smith had been fair in his evaluation of the defendant, and further concluded that the defendant was seeking an additional expert because he did not like the opinion of his first expert.  The Court found that defense counsel was looking for an expert that had the same view as counsel with regard to the disorder and that said motion is both unreasonable and unnecessary.  The Court felt it necessary to draw the line somewhere.  Having ruled on the issue in April, 1991, the Court revisited the issue in September, 1991, when the State agreed to "accede" to the defendant's request for an additional expert if the defendant would suggest an expert in a more reasonable proximity rather than one located in Baltimore, Maryland.  During the hearing, defense counsel suggested to the Court that the psychologist Russell Monroe would perform his services at the rate of $100 per hour and counsel estimated that the total expenditure would be $500.00.  It is likely that defense counsel's estimate was woefully short of what would be necessary to engage the services of Russell Monroe.  Counsel suggested to the Court that the sheriff transport the defendant to an area in the Eastern Panhandle where Dr. Monroe would interview and perform the evaluation.  Thereafter, Dr. Monroe would proffer a report.  If favorable to the defendant, Dr. Monroe would have been called to testify.

(ECF No. 12, Ex. 18 at 20-21).

Judge Nibert's Final Order further indicates that the petitioner was also evaluated by Dr. Timothy Saar, a licensed psychologist, on February 23, 2007 (during the petitioner's circuit court habeas corpus proceedings). Dr. Saar found that, at the time of these crimes, the petitioner suffered from IED. (*Id.* at 21). The Final Order further notes that Dr. Saar's opinion is based upon information made available to him by the petitioner's counsel, and his examination and testing of the petitioner in 2007, 17 years after the incident. (*Id.*) Judge Nibert's Order characterizes Dr. Saar's opinion as follows:

> Dr. Saar states in his summary that given the recent (in 1990) introduction of the disorder into psychological nomenclature, only a provisional diagnosis of [IED] was made by Dr. Rush, and Dr. Smith, apparently, rejected this idea of this particular diagnosis altogether. Dr. Saar concludes that because of these factors, Mr. Harper was denied a defense that would have focused on his "intent" and if accepted by the jury, may well have resulted in a lesser conviction or possibly an acquittal. Dr. Saar's conclusions apparently ignore Dr. Rush's opinion one must rule out alcohol intoxication as the reason for Mr. Harper's loss of control. Furthermore, Dr. Saar had no documents indicating Dr. Smith rejected [IED] as a potential diagnosis. In this Court's opinion, Dr. Saar misses the point as to Dr. Rush's opinion as well as Dr. Smith's opinion in reaching his legal conclusion (outside his area of expertise) that Petitioner was denied a defense focusing on his "intent."

(*Id.* at 21-22). Judge Nibert then made these additional findings and conclusions of law:

> Despite the Petitioner's assertions, there is nothing in the record to indicate that Dr. Monroe would have presented the defense he sought. Judge McCarty stated the issue was not the funds required but whether the request was reasonable considering the fact that an evaluation had been performed by an expert chosen by the defendant's attorneys. After hearing Dr. Smith's testimony, Judge McCarty concluded that Dr. Smith conducted an objective analysis of the defendant and formed an opinion which the defendant and his counsel did not like. Judge McCarty found the request for the additional evaluation by Dr. Monroe unreasonable and unnecessary. A review of Dr. Smith's testimony leads this Court to the same conclusion.

> The petitioner herein was given a fair opportunity to explore a potential defense relating to the issue of the necessary element of intent

required for murder and voluntary manslaughter.  The trial court's ruling denying Petitioner a second opportunity to explore such potential defense was reasonable considering the trial court's finding, supported by the evidence, that Dr. Smith conducted an objective evaluation.

As a result, this Court does hereby deny the defendant's relief sought on the Amended Petition.

(*Id.* at 22).

The petitioner, by counsel, filed a Motion for Reconsideration (ECF No. 12, Ex. 19), which was denied by Judge Nibert on June 27, 2011 (ECF No. 12, Ex. 20).  The petitioner then filed a Petition for Appeal, which the SCAWV construed as only challenging the denial of his Motion for Reconsideration.  The court found "no clear error or abuse of discretion by the circuit court."  (ECF No. 12, Ex. 26).  The SCAWV's Memorandum Decision characterized the petitioner's claim in the following manner:

Petitioner argues that whether he suffered from intermittent explosive disorder was a jury question, and that he was denied a fair presentation of this defense by the trial court's denial of his request for a second expert.

(*Id.*)  The SCAWV affirmed the circuit court's decision denying habeas corpus relief. (*Id.*)

The respondent's Motion for Summary Judgment asserts that the petitioner was not denied the right to present witnesses in his own defense.  His Memorandum of Law states:

The Compulsory Process Clause of the Sixth Amendment, along with due process protections extended by the Fourteenth Amendment, creates a substantive right of an accused to present a meaningful defense to criminal charges. *See Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *Taylor v. Illinois*, 484 U.S. 400, 408 (1988).  "The right to offer the testimony of witnesses, and to compel their attendance, . . . is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967).  "Few rights are more

fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

(ECF No. 32 at 17).   The respondent further asserts, however, that this right is not without limits, and that, in order to demonstrate a Sixth Amendment violation, the petitioner "must show that the court arbitrarily excluded evidence that was critical to the case and that the excluded evidence tended to be exculpatory."   (*Id.*) (citing *Chambers*, 410 U.S. at 297-302).   The respondent further emphasizes that trial court evidentiary rulings are essentially matters of state law that do not implicate a federal constitutional issue, and that, to the extent the petitioner's claim does implicate the Compulsory Process Clause, "it is nonetheless ancillary to a trial court's discretion in ruling on the admissibility of witness testimony at trial and has been treated as such by federal reviewing courts."   (*Id.* at 18 n.8).   His Memorandum of Law adds:

> The Petitioner portrays the trial court's refusal to fund the defense's doctor shopping as denying him a complete defense.   Clearly that is not the case. In fact, the ruling of the trial court was not even an evidentiary ruling sufficient to implicate neither [sic; either] *Estelle* [*v. McGuire*, 502 U.S. 62 (1991)], nor [sic; or] the Compulsory Process Clause of the Sixth Amendment.   The trial court never refused to allow the defense to put on evidence.   The trial court even provided additional funding upon the first request to continue aid in finding an expert.   Upon the testimony of a second, qualified expert, the court finally refused to order funding for additional expert fees.

(*Id.* at 20).   Thus, the respondent contends that the trial court never ruled on the admissibility of the petitioner's theory of defense; rather, the court simply "refused to fund the defense's continued request to shop for an agreeable expert witness."   (*Id.* at 20-21).

The petitioner's Response to the respondent's Motion for Summary Judgment disputes the respondent's contention that this claim does not present any federal issue that would be cognizable in federal habeas corpus.   (ECF No. 38 at 3-4).   The petitioner

further asserts that "the right to present a complete defense is violated by the exclusion of defense evidence when the state rule of evidence did not rationally discern any purpose." *Holmes v. South Carolina*, 517 U.S. 319, 331 (2006); *Rock v. Arkansas*, 483 U.S. 44, 61 (1987); *Chamber v. Mississippi*, 410 U.S. at 302-303; *Washington v. Texas*, 388 U.S. 14, 22 (1967).  (*Id.* at 4-5).  The petitioner also cites several federal circuit court cases in which the courts found due process violations arising out of the court's failure to allow defense psychiatric expert witnesses.  (*Id.* at 5 n.1) [Citations omitted].

The petitioner contends that, because his mental state at the time of the crimes was a critical element, the State had an affirmative duty to assist him, an indigent defendant, to obtain qualified experts, and the State failed in this "constitutional duty." (*Id.* at 6).  He further asserts that "this constitutional right was abridged for financial grounds." (*Id.* at 6).  He further contends that, had Dr. Russell Monroe, "a respected authority" on IED, assisted the defense counsel in the evaluation, preparation and presentation of his criminal defense, the outcome of the trial would be different.  *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985).  (*Id.* at 8).  His Response further states:

> Dr. Monroe could have competently testified to his opinion that IED is a form of mental defect which could lead to impulsive behavior, the *vel non* of the mental states of premeditation and deliberation.  Even if Dr. Monroe's testimony was found to be insufficient for acquittal, it would compel jurors to give [sic] seriously consider adding a recommendation of mercy to their verdict or return a guilty finding of a lesser included offense.

(*Id.*)

In *Barbe v. McBride*, 521 F.3d 443, 452-53 (4th Cir. 2008), the Fourth Circuit held that:

> Importantly in considering federal habeas corpus issues involving state evidentiary rulings, "we do not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so

extreme as to result in a denial of a constitutionally fair proceeding." *Burket v. Angelone*, 208 F.3d 172, 186 (4th Cir. 2000). "It is only in circumstances impugning fundamental fairness or infringing specific constitutional protections that a federal question is presented." *Spencer v. Murray*, 5 F.3d 758, 762 (4th Cir. 1993) (internal quotation marks omitted*); see also Estelle v. McGuire*, 502 U.S. 62, 68, 112 S. Ct. 475, 116 L. Ed.2d 385 (1991) (explaining that "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States").

As noted by Judge Nibert in his Final Order denying the petitioner habeas corpus relief on this ground, "there is nothing in the record to indicate that Dr. Monroe would have presented the defense that [the petitioner] sought" and "the issue was not the funds required but whether the request was reasonable considering the fact that an evaluation had been performed by an expert chosen by the defendant's attorneys." (ECF No. 12, Ex. 18 at 22). The undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that the trial court's refusal to allow the petitioner to seek an additional expert witness on the IED issue was fundamentally unfair or a miscarriage of justice and, thus, Petitioner has not demonstrated a violation of his right to compulsory process, due process of law, or equal protection under the Sixth and Fourteenth Amendments. The undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law; nor were they based on an unreasonable determination of the facts presented in the state court proceeding. Thus, the undersigned further proposes that the presiding District Judge **FIND** that the Respondent is entitled to judgment as a matter of law on Grounds 1 and 10 of Petitioner's Amended Petition.

## C.      Ground 2 - Ineffective assistance of counsel.

As noted previously above, the court will address the merits of the following claims of ineffective assistance of counsel raised by the petitioner:

d.      Counsel failed to *voir dire* jury regarding the impact of Killeen, Texas murders.

k.      Counsel failed to ascertain Dr. Ralph Smith's opinion prior to offering his expert testimony.

l.      Counsel failed to introduce prior written statement of Connie Nichols.

m.     Counsel failed to timely object to prosecutor's improper rebuttal argument and failed to request a mistrial.

In *Strickland v. Washington*, 466 U.S. 688 (1984), the Supreme Court adopted a two-prong test for determining whether a defendant received adequate assistance of counsel.  A defendant must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687-91.  Moreover, "judicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689.  Furthermore, the AEDPA "adds a layer of respect for a state court's application of the legal standard."  *Holman v. Gilmore*, 126 F.3d 876, 881 (7th Cir. 1997).

In reviewing a trial counsel's performance, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance, *id.* at 689, and the burden is on the petitioner to show prejudice.  *Hutchins v. Garrison*, 724 F.2d 1425 (4th Cir. 1983).  Further, "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Strickland*, 466 U.S. at

690.   A petitioner may not merely speculate about potential prejudice but must "affirmatively prove" that the result of the proceedings would have been different but for the deficient performance of trial counsel.  *See Strickland*, 466 U.S. at 693.  Using this standard, the undersigned will address each of Petitioner's claims of ineffective assistance of counsel.

The respondent's Memorandum of Law in support of his Motion for Summary Judgment does not individually address the petitioner's claims of ineffective assistance of counsel.   Rather, the Memorandum of Law cites the *Strickland* standard and emphasizes that the petitioner must demonstrate <u>both</u> that his counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unreasonable performance, the outcome of his case would have been different.  (ECF No. 32 at 21).  The Memorandum of Law further states:

> Although *Strickland* does not stand for the proposition that overwhelming evidence of guilt lowers the standard of representation, it nonetheless holds that its prejudice analysis is performed based on the weight of the evidence presented at trial.  *Strickland*, 466 U.S. at 695.  "[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."  *Id.*  'Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."  *Id.* at 696.

> * * *

> Further, the Supreme Court advised that a claim of ineffective assistance of counsel is not intended to be a figurative "do-over" fraught with "what-ifs" as it would be too "tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  *Strickland*, 466 U.S. at 689.  Such behavior by a court of review is thusly prohibited.  *Id.*  "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment," and must "affirmatively prove prejudice" – that the particular

errors of counsel were not only unreasonable, but "actually had an adverse effect on the defense."  *Id.* at 690-93.

(*Id.* at 22-23).   The respondent contends that, given the overwhelming amount of evidence of guilt, the petitioner's counsel had very few options in building a defense, and "the Petitioner's claims highlighting individual instances of ineffective counsel are no stronger than his broad, overarching claim."   (*Id.* at 23).   The respondent further contends that "the Petitioner has failed to supplement his hollow ineffective assistance of counsel claims with anything other than the exact, speculative 'what-ifs' prohibited by the Supreme Court throughout any level of his direct appeal or habeas proceedings." (*Id.*)

The undersigned will address the petitioner's four exhausted claims of ineffective assistance of counsel in turn.

### *Ground 2(d)- Impact of Killeen, Texas murders*

On the second day of the petitioner's trial, October 16, 1991, a man shot 43 people in a Killeen, Texas cafeteria, killing 23 of them.   Ground 2(d) of the petitioner's Amended Petition asserts that his trial counsel was ineffective for failing to request that the jurors be questioned or polled as to whether the possibility that news coverage of this incident had improperly influenced them.  (ECF No. 24 at 9).  The petitioner cites *Loving v. U.S.*, 517 U.S. 748 (1996), but provides no further support for this claim.[4]

The only mention of the Killeen, Texas murders during the petitioner's trial involved a brief reference to the incident by the trial court during the charge conference,

---

[4]  Other than the fact that *Loving* also involved murders that took place in or near Killeen, Texas, the undersigned is uncertain why the petitioner cited this case, which is an appeal from the United States Army Court of Military Review.  The case involved a general court-martial of the defendant, an Army private stationed at Fort Hood who was accused of two murders, and the issues addressed by the Supreme Court involved questions concerning the separation of powers and the military death penalty scheme.

out of the presence of the jury (ECF No. 12, Ex. 34 at 248).  The petitioner has done no more than speculate that such an incident would unduly influenced his jury.

A defendant is guaranteed a trial by an impartial jury under the Sixth and Fourteenth Amendments.  *See, e.g., Duncan v. Louisiana*, 391 U.S. 145, 149 (1968); *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due Process requires that the accused receive a trial by an impartial jury free from outside influence.").  "The 'essential function of voir dire is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel . . . .'"  *United States v. Brown*, 799 F.2d 134, 135-36 (4th Cir. 1986) (other citations omitted).

Absent contrary indications, jurors are presumed to be impartial.  *Poynter v. Ratcliff*, 874 F.2d 219, 221 (4th Cir. 1989).  Moreover, courts will presume that jurors will follow the court's instructions, including the admonishment to avoid any media coverage of the trial.  *Jones v. United States*, 527 U.S. 373, 394 (1999).  The defendant bears the burden of showing a strong possibility of juror bias.  *Wells v. Murray*, 831 F.2d 468, 472 (4th Cir. 1987).

Standing alone, juror exposure to media coverage concerning a defendant's charges does not presumptively deprive the defendant of due process.  *Murphy v. Florida*, 421 U.S. 794, 799 (1975).  Prejudice may be presumed, however, when pre-trial and mid-trial publicity is so invasive that the setting of the trial becomes "inherently prejudicial."  *Id.* at 803; *see also Sheppard*, 384 U.S. at 352, 363.  In order to establish actual prejudice, a petitioner must demonstrate "the actual existence of [] an opinion in the mind of the juror as will raise the presumption of partiality."  *Murphy*, 421 U.S. at 800 (internal quotation marks omitted) (quoting Irvin, 366 U.S. at 723).  Merely citing

to media coverage or a preexisting knowledge of the facts of the case by jurors is not enough.

Extending this clearly-established precedent to the issue raised by the petitioner concerning media coverage of a separate, and quite egregious, shooting incident, the petitioner has not shown that his conviction was fundamentally unfair because of the possibility that jurors may have learned of and been affected by the news of the Killeen, Texas murders that occurred on the second day of the petitioner's trial.  Thus, even if the petitioner could somehow establish that it was unreasonable for his counsel not to request that the jury be polled on this issue, he falls short of demonstrating the necessary prejudice to overturn his conviction on this basis.   Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the petitioner cannot establish a claim of ineffective assistance of counsel on this basis, that the denial of relief on this basis was neither legally nor factually unreasonable, and that the respondent is entitled to judgment as a matter of law on Ground 2(d) of the petitioner's Amended Petition.

<u>*Ground 2(k) – Failure to discover Dr. Smith's opinion*</u>

In Ground 2(k) of his Amended Petition, the petitioner contends that his trial counsel was ineffective because they failed to ascertain that Dr. Ralph Smith, the defense's proposed expert on the petitioner's mental state at the time of the crimes, subjectively denied the existence of IED as a possible diagnosis, before they selected him as an expert and offered his testimony to the trial court.  (ECF No. 24 at 10).

The petitioner's Response asserts that the petitioner's mental state at the time of the crimes was a critical issue, which was addressed from the opening statements all the way through closing arguments.  His brief states:

In his opening statement, Mr. Sergent directed the jury's attention to the defendant's state of mind., i.e.,

> The second part of this case is mental.  The mental state when an act occurred . . . So just if the State proves an act that's half of their burden.  They have to prove the mental state . . . The State has charged first degree murder.  These other second degree and voluntary manslaughter are what's called a lesser included offense . . . The reason why this is going to be a hard case for you to decide and a hard case for the State to prove, is that an act, the same act occurs in all three of these.  The difference is the mental state . . . Trial Transcript, 10-15-91, Vol. I, p. 221.
>
> In all three of these there is some intention and you'll be explained that in voluntary manslaughter, 2nd degree murder and 1st degree murder, intention, a mental state has to be there.  It has to be proven beyond a reasonable doubt... What was going on in Roger Harper's mind is going to be the hard part for you to decide.  Trial Transcript, 10-15-91, Vol. 1, p. 222.
>
> * * *
>
> This case will depend on the evidence that the State presents about the mental state of Roger Harper . . . The question is what was in the mind at the critical time that the law says you have this mental state . . . Remember if the State doesn't prove the mental state then the offense is not an offense.  It may be another offense, a lesser offense, but it's not, unless they prove the mental case.  Trial Transcript, 10-15-91, Vol. I, p. 224, 225 (lines 11-15).

(ECF No. 38 at 12-13).

The petitioner's testimony stressed that he had no memory of the shootings and the events immediately following.  However, when the trial court refused to allow the defense to retain another expert witness after Dr. Smith did not render the opinion the defense was seeking, the defense abandoned its attempts to present any sort of diminished capacity defense.  As noted by the petitioner in his Response:

> In his closing argument, Mr. Evans emphasized that "[t]here is no evidence . . . that this man (petitioner) suffers from a mental disease, a

mental defect." (Trial Transcript, 10-18-91, Vol. IV, pp. 84). There was no formal psychiatric or psychological evidence of petitioner's mental status introduced at trial, but Mr. Evans would have been cognizant of Dr. Robert Rush's provisional diagnosis of Intermittent Explosive Disorder (Appendix IED Chronology). And, latter [sic; later], he resorted to an eye-for-an-eye retribution, i.e., "well I submit to you, some barnyard justice would tell you, what's good for the goose is good for the gander." (Trial Transcript, 10-18-91, Vol. IV, pp. 115). In his closing argument, Mr. Benford stressed the mental state of the defendant at the time of the shooting. (Trial Transcript, 10-18-91, Vol. IV, pp. 88-89).

(ECF No. 38 at 14). The Response further asserts:

> The State Supreme Court of Appeals has held that a diminished capacity defense requires expert testimony that, at the time of the crime, a defendant had a mental disease or defect that rendered him incapable of forming the requisite mental state of the crime charged, *State v. Joseph*, 214 W. Va. 525 (2003). Petitioner contends that Mr. Sergent and Mr. Benford were ineffective because they failed to offer a diminished capacity defense based on the testimony of Dr. Robert Rush or Dr. Russell Monroe that, at the time of the crime, petitioner had a mental disease, i.e. Intermittent Explosive Disorder, that rendered him incapable of forming the intent, deliberation or premeditation for a 1st Degree murder as alleged in the indictment, *Strickland v. Washington*, 466 U.S. 691 (1984).

(*Id.* at 15).

The undersigned has already addressed the petitioner's claims that that the trial court's failure to allow him to retain another expert witness concerning the petitioner's mental state and his provisional IED diagnosis did not result in a violation of the petitioner's Sixth or Fourteenth Amendment rights, and did not result in an unfair trial. Consequently, even if the petitioner could show that his counsel's failure to determine Dr. Smith's opinion prior to offering his testimony to the trial court, *in camera*, fell below an objective standard of reasonableness, the petitioner ultimately cannot affirmatively prove that, but for counsel's allegedly unreasonable conduct, the result of the proceedings would have been different. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the petitioner cannot establish a claim of

ineffective assistance of counsel on this basis, that the denial of relief on this basis was neither legally nor factually unreasonable, and that the respondent is entitled to judgment as a matter of law on Ground 2(k) of the petitioner's Amended Petition.

### Ground 2(l) – Failure to introduce Nichols' prior statement

In Ground 2(l) of his Amended Petition, the petitioner asserts that his counsel was ineffective because they failed to attempt to introduce a written statement given by Connie Nichols through the testimony of Sgt. H.M. Eads, the investigating officer who took the statement. (ECF No. 24 at 10). The petitioner did not address this specific claim in his Response.

The defense attempted to have Nichols' written statement admitted as evidence after the statement was read to the jury in its entirety by the trial court during Nichols' cross-examination. The trial court ultimately instructed the jury that they could only consider the statement for impeachment purposes, to judge the credibility of Nichols as a witness, and the trial court did not admit the statement itself as an exhibit that could be considered as evidence of guilt or innocence. Thus, it appears that the petitioner is claiming that his counsel should have otherwise attempted to have the written statement admitted through the testimony of the officer who took it.

However, the statement itself was hearsay, because it was an out of court statement, which was not made under oath, and which was essentially being offered by the petitioner for the truth of the matter asserted. The petitioner has not established that this statement was admissible under any exception to the hearsay rule. Nor has he demonstrated that the failure to get this statement admitted resulted in any undue prejudice to his defense. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the petitioner has not demonstrated that his counsel provided

ineffective assistance in this regard. The undersigned further proposes that the presiding District Judge **FIND** that the denial of relief on this claim was not legally or factually unreasonable, and that the respondent is entitled to judgment as a matter of law on Ground 2(l) of the petitioner's Amended Petition.

### *Ground 2(m) – Failure to timely object to prosecutor's closing argument*

In Ground 2(m) of his Amended Petition, the petitioner contends that his counsel failed to timely object to improper comments made during the prosecutor's rebuttal closing argument and also failed to move for a mistrial on that basis. (ECF No. 24 at 10). In Ground 8 of his Amended Petition, which is address *infra*, the petitioner asserted that these comments denied him a fair trial. However, as noted herein, habeas relief is only warranted if a prosecutor's remarks rendered the trial fundamentally unfair. The undersigned has proposed, *infra*, that the presiding District Judge **FIND** that the petitioner was not denied a fair trial based upon the remarks of the prosecutor during his closing arguments. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the petitioner cannot satisfy the prejudice prong of the *Strickland* standard and, thus, he is not entitled to habeas corpus relief on this basis. Therefore, the undersigned further proposes that the presiding District Judge **FIND** that the respondent is entitled to judgment as a matter of law on Ground 2(m) of the petitioner's Amended Petition.

### D.    Ground 4 – Instructional error.

In Ground 4 of his Amended Petition, the petitioner asserts that he was denied a fair and impartial jury trial when the trial court failed to provide the jury with complete and accurate instructions on the law applicable to his case. (ECF No. 24 at 12). The petitioner first contends that there was a material variance between the charges in the

indictment and court's instructions to the jury.  In particular, the petitioner contends that the trial court improperly refused to give an instruction on voluntary manslaughter, and gave other instructions which, he asserts, were inaccurate statements of the law. The Amended Petition further states:

> The trial court did not give any instruction proposed by Defense Counsel which would have provided the juror[s] an accurate and complete explanation of the law, including but not limited to, an identification of the elements of voluntary manslaughter.  The Court gave an instruction, over defense counsel's objection, dealing specifically with the testimony of Connie Nichols.

> State instruction #1 concerning the testimony of Ms. Nichols contained an improper statement of the law and should not have been given and [] the prior inconsistent statements should have been considered as evidence.  The Court used State Instruction 2A, and refused to give Defense Instruction #6 and refused to give Defense Instruction H [which] was error as Defense Instruction H properly stated the law.  The Court refused Defense Instruction #6 concerning the impeach[ment] of a witness and was necessary given the testimony of Connie Nichols.  And, the trial court refused to give the jury Defense Instruction 11A concerning the uncorroborated testimony of a prosecution witness.

> The Trial Court used State Instruction #4 when he instructed the jury on the element of malice.  This instruction was not supported by the evidence presented by the State in the Case in chief.  Over the past century, the [SCAWV] has approved multiple jury instructions regarding the element of malice and the inference of malice from the use of a deadly weapon in homicide prosecutions.  *State v. Douglass*, 28 W. Va. 297, 299 (1886); *State v. Saunders*, 108 W. Va. 148, 150 S.E. 519 (1929); *State v. Bongalis*, 180 W. Va. 584, 378 S.E.2d 449 (1989), Petitioner was indicted on January 24, 1989.  In 1994, the [SCAWV] revised and replaced the model instruction regarding the inference of malice from the use of [a] deadly weapon.  *State v. Jenkins*, 191 W. Va. 87, 443 S.E.2d 244 (1994). The instruction offered in petitioner's trial regarding malice was not congruent with state constitutional law as interpreted by the [SCAWV].

(ECF No. 24 at 13).

The respondent's Memorandum of Law in support of his Motion for Summary Judgment asserts that the petitioner's claims are grounded in a request for instructions

that were not supported by the evidence.  (ECF No. 32 at 25-26).  His Memorandum further states:

> As grounds in support of this claim the Petitioner challenges the refusal of the trial court to give the jury an instruction on voluntary manslaughter.  The Petitioner further argues that the court's instruction on the element of malice was not supported by the evidence at trial.  Specifically, the Petitioner challenges the court's instruction to the jury that they could infer malice from the Petitioner's use of a firearm.
>
> In *Estelle v. McGuire*, 502 U.S. 62 (1991), the Supreme Court established the showing required to obtain habeas relief based on a challenge to a jury instruction.  *Estelle* made clear that "the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief."  *Id.* at 71-72 (citing *Marshall v. Longberger*, 459 U.S. 422, 438 n.6 (1983)).
>
> In the present case, however, the Petitioner is challenging an instruction that was rejected by the trial court.   In light of the overwhelming evidence of guilt at trial to convict the Petitioner on the charges in the indictment, this claim cannot possibly form the foundation for relief in federal habeas.  It is well established that an instruction on a lesser included offense is not required where there is evidence to support the greater charges as contained in the indictment.  *See Schmuck v. United States*, 489 U.S. 705, 715-16 (1989).  The quality and volume of evidence of guilt renders this claim preposterous under any analysis.  Even in cases where the evidence would support a conviction on a lesser offense, any such error is rendered harmless in light of [not?] only sufficient evidence to convict on the greater charge[,] but in this case, the evidence was beyond overwhelming.  No error could possibly have flowed from the trial court's refusal to give an instruction that was void of supporting evidence at trial.  *See Brecht v. Abrhamson*, 507 U.S. 619, 637 (1993) (any challenge to a trial court ruling must show it resulted in "actual prejudice").
>
> The refusal of the trial court to give an instruction that was not supported by the evidence as a matter of state law fails to raise an issue cognizable in federal review and must be summarily dismissed as a matter of law.

(ECF No. 32 at 26).

> The petitioner's Response elaborates on this claim as follows:

> "It is an 'ancient doctrine' that a criminal defendant may be held to answer for only those offenses contained in the indictment."  <u>Schmuck v. U.S.</u>, 489 U.S. 705, 717-18, 109 S. Ct. 143, 103 L. Ed.2d 735, rehearing denied,

490 U.S. 1076, 109 S. Ct. 2091, 104 L. Ed.2d 654 (1989); Article IV, § 3 of the Constitution of West Virginia. State law mandates that all homicide prosecutions be initiated by an indictment, and the indictment returned by the Grand Jury must substantially comply with _W. Va. Code_ § 62-9-3, i.e.,

> That A . . . . . , on the . . . . . day of . . . . . in the said county of .
> . . . . feloniously, willfully, deliberately and unlawfully did slay, kill and murder one B. . . . ., against the peace and dignity of the State. Upon the trial of such indictment the accused may be convicted of either murder of the first degree, murder of the second degree, voluntary manslaughter, or involuntary manslaughter, as the evidence may warrant.

The Grand Jury of Roane County returned an indictment that did not substantially comply with the legislatively prescribed form of the indictment for murder.

(ECF No. 38 at 31).

The petitioner contends that, based upon the evidence presented at trial, he was entitled to an instruction on voluntary manslaughter, as a lesser included offense of murder, and that the failure to give such an instruction violated his due process rights. _Hooper v. Evans_, 456 U.S. 605, 609 (1982). (ECF No. 38 at 31-32). He further contends:

> Petitioner's defense at trial was that although the shootings occurred, he did not remember firing the fatal shots. On October 18, 1991, the Circuit Court denied petitioner's renewed request for an instruction on voluntary manslaughter. (_State v. Harper_, Trial Transcript, 10-18-91, Vol. IV, pp. 17-19).
>
> * * *
>
> The Defense theory of the case was that the State failed to prove malice in all three shootings, and, to the extent that petitioner was experiencing intermittent explosive disorder at the time of the shootings, petitioner could not form the requisite intent, deliberation or premeditation necessarily [sic; necessary] for a finding of murder in the first degree, so the state court was required to instruct not only on the elements of First Degree murder but also all the lesser included offenses as set forth in W. Va. Code § 62-9-3. To the extent that this did not occur, petitioner was denied a full, fair and impartial jury trial.

(*Id.* at 32-33).

The transcript of the charge conference is difficult to follow because the full text of the proposed instructions is not included in the record before this court.  Nor has the petitioner provided the text or any specific information concerning the particular instructions he is challenging.  Nevertheless, the undersigned will attempt to address the instructions challenged by the petitioner.

Looking first at the petitioner's claims concerning the instructions about malice, a review of the trial transcript indicates that the prosecutor offered an instruction on malice (State's Instruction No. 5)[5] that was similar to what was already in the court's proposed charge, but added language "that the malice may be inferred from any deliberate and cruel act, which is, including the use of a deadly weapon done by the Defendant without any reasonable provocation or excuse however sudden."  (ECF No. 12, Ex. 34 at 220).  The court asked whether there were any objections to using the State's proposed instruction.  (*Id.* at 222).

Defense counsel stated that they only objected to the instruction to the extent that the defense was offering a comprehensive instruction on the first degree murder counts, which incorporated all of the elements of first and second degree murder, and voluntary and involuntary manslaughter, including a definition of malice.  The defense also objected to this instruction to the extent that it was redundant.  (*Id.* at 223).  Ultimately, however, the defense did not object to the amendment of the malice instruction to be used by the court to state, "including the use of a deadly weapon."  (*Id.*

---

[5]  The petitioner's Amended Petition refers to this as State's Instruction No. 4.  (ECF No. 24 at 13).

at 224).  In fact, before the instructions were read to the jury, the petitioner's counsel,

Mr. Benford, clarified the defense's position on the malice instruction as follows:

> MR. BENFORD:      Mr. Sergent indicated that we didn't have an objection
> to the malice instruction, but I think a more correct statement would be,
> we think it properly states the law, but we do want to object for the same
> reasons we made [in] our motions for judgment of acquittal.  That is, it's
> our contention that the evidence doesn't show malice.

(ECF No. 12, Ex. 35 at 45).  The trial court overruled that objection.  (*Id.*)

> Thus, the instruction on malice that was ultimately given to the jury stated:

> The word malice, as used in these instructions, is used in a technical
> sense.  It may be either expressed or implied and it includes, not only
> anger, hatred and revenge, but other justifiable motives.  It may be
> inferred or implied by you from all the evidence in this case.

> If you find such inference is reasonable from facts and
> circumstances, in this case, which have been proven to your satisfaction,
> beyond all reasonable doubt.  It may be inferred from any deliberate and
> cruel act, including the use of a deadly weapon.  Done by the Defendant
> without any reasonable provocation or excuse, however sudden.

> Malice is not confined to ill will towards anyone or more particular
> persons, but malice is every evil design in general, and by it is meant that
> the fact has been attended by such circumstances as are ordinarily
> symptoms of a wicked, depraved and malignant spirit, and carry with
> them the plain indications of a heart, regardless of social duty and fatally
> bent on mischief.

> It is not necessary that malice must have existed for any particular
> length of time and it may first come into existence at the time of the act or
> at any previous time.

(ECF No. 12, Ex. 35 at 64-65).  The court then instructed the jury on the required

elements of first and second degree murder.  (*Id.* at 65).

The petitioner's Amended Petition also challenges the giving of a malice

instruction on the basis that the evidence did not support a finding of malice.  The

petitioner also contends that, in *State v. Jenkins*, 443 S.E.2d 244 (1994), the SCAWV

"revised and replaced the model instruction regarding the inference of malice from the use of a deadly weapon in homicide cases."  (ECF No. 24 at 13).[6]

These claims are coupled with the petitioner's contention that the trial court improperly refused to instruct the jury on voluntary manslaughter, which, the petitioner contends, was supported by the evidence. Despite the defense's assertion that the incident between the petitioner and Chuck Tanner just prior to the shootings could constitute provocation, which could reduce a murder charge to voluntary manslaughter, the trial court found that a voluntary manslaughter instruction was not warranted.  The court relied upon the holding of the SCAWV in *State v. Murphy*, 109 S.E. 771 (W. Va. 1921), finding that:

> "Provocation from sudden passion reducing homicide to manslaughter must arise from physical injury inflicted or attempted.  Provocation for the sudden passion which will reduce a homicide to voluntary manslaughter must arise from something more than a quarrel or altercation which consists of a warm contention in words."

(ECF No. 12, Ex. 35 at 6).  The petitioner's counsel argued that the evidence at trial showed "something more than mere words" and asserted that Chuck Tanner's agitated behavior could be construed as preparation for a fight.  (*Id.* at 6-10).  The defense further noted that, within a very short period of time after Tanner tapped the petitioner on the shoulder on the dance floor, the petitioner allegedly stated, "they're pissing me off."  (*Id.* at 10-11).  The defense asserted that whether the petitioner was sufficiently provoked was a jury question.  (*Id.*)

After hearing more argument about how the facts could be interpreted by the jury, the trial court ultimately ruled as follows:

---

[6]  In *Jenkins*, which was decided three years after the petitioner's trial, the SCAWV among other things, clarified that "instructions about the inference of malice [as opposed to a presumption], if supported by the evidence, are permissible."  443 S.E.2d at 250.

I think it's clear, in the law of the State of West Virginia that there has to be, in the mind of the Court, evidence before a jury that would support a verdict for a particular offense before a person could be found guilty of that offense.

We can't simply make a charge of an offense because it's included in a more serious indictment. Such as a person charged with murder, we can't automatically say, "Well, we've got to include all of the other charges there, murder 2, voluntary manslaughter and involuntary manslaughter."

I don't think that we can do that, simply, because the serious charge has been made. There's evidence of a very serious offense of murder, of murder 1, of murder 2, of murder with the recommendation of mercy. There has to be, in the minds of the Court, there has to be evidence that support[s] a conviction of that offense.

In the mind of the Court, if there was no charge of murder here, and under these facts and circumstances, if the Defendant was being charged with voluntary manslaughter and the case was presented to the Court, I don't see how you could get to the provocation part there. I don't see any.

I don't see anything that would reach the standard that would reduce a homicide to voluntary manslaughter. This *Murphy* case here, and I don't believe that the law has changed in any real manner, "Voluntary manslaughter must arise from something more than a quarrel or altercation, which consists of a warm contention in words, or a dispute carried on with heat or anger. Such provocation can arise only from any injury inflicted or attempted."

There's no such evidence, here, in this case, which in the opinion of this Court would support a conviction of voluntary manslaughter. I think what the defense counselor is relying on is more conjecture than actual evidence.

Accordingly, it's going to be the rule of the Court and the ruling in this case that evidence does not exist which would support a verdict of voluntary manslaughter. The instructions that will be allowed would be the instructions on murder 1, murder 2, and of course, the malicious assault instructions.

(ECF No. 12, Ex. 35 at 17-18).

Generally speaking, allegations concerning instructional error are not cognizable on federal habeas review, because they raise issues of state law, not federal constitutional law. The standard of review of a due process claim stemming from a state

court's instruction requires that there be a reasonable likelihood that the jury applied the challenged instruction in an improper manner and that the instruction, considered in the context of other instructions and of the trial as a whole, infected the entire trial. *See Estelle v. McGuire*, 502 U.S. 62, 72-73 (1991).

Claims regarding jury instructions do not state a federal claim absent a showing that an instruction "by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). Moreover, "the fact that [a jury] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle,* 502 U.S. at 71-72 (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983)).

> It is black letter law that a federal court may grant habeas relief "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (West Supp. 1998); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed.2d 385 (1991) (emphasizing that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States.").

*Wright v. Angelone*, 151 F.3d 151, 157 (4th Cir. 1998).

In the instant case, applying the authority of the state's highest court, the trial court found that the evidence did not support an instruction on voluntary manslaughter. As noted above, it is not the province of this court to re-visit whether that determination was correct. Rather, construing this claim broadly as an assertion that instructing the jury on malice and the inference thereof, and the failure to instruct the jury on voluntary manslaughter, resulted in the denial of a fair trial for the petitioner, and viewing the instructions as a whole in light of all the evidence presented, the undersigned proposes

that the presiding District Judge **FIND** that the instructions, given or omitted, did not so infect the entire trial as to result in a violation of due process.

The remainder of Ground 4 of the petitioner's Amended Petition challenges the trial court's decisions to give certain instructions offered by the State, rather than instructions offered by the defense.  He further asserts that certain instructions offered by the State were incorrect statements of the law.[7]  Simply because the trial court gave certain instructions that were offered by the State in lieu of instructions offered by the defense is not a sufficient basis to overturn a conviction, so long as the instructions that were given to the jury, taken as a whole and in the context of the evidence presented at trial, were a correct statement of the law.

In particular, the petitioner contends that "State's instruction # 1 concerning the testimony of Ms. Nichols contained an improper statement of the law and should not have been given and that the prior inconsistent statements should have been considered as evidence."  (ECF No. 24 at 13).  The transcript of the charge conference indicates that the trial court determined to give State's instruction # 1, over the objection of the defense.  The following discussion occurred:

MR. EVANS:    Judge, the first instruction I have is, well, its marked State's No. 1.  It deals with the witness, Connie Nichols.

(Judge reading)

THE COURT:    I think that's correct.  Have you all got a copy of it?

MR. SERGENT:    Yes, Your Honor.

MR. BENFORD:    I believe that the proper way for the jury to be instructed is to give it a general instruction on prior

---

[7]  Again, it is difficult to address these claims because the text of the instructions that were not given is not a part of the record before this court.

|  | inconsistent or prior statements, not to single out just one -- |
|---|---|
| THE COURT: | How many prior inconsistent statements have we have that was used and actually referred to? |
| MR. EVANS: | I think this is what you were told us to do, Judge. |
| THE COURT: | That's what I told you to do, now, we're just starting -- |

* * *

|  |  |
|---|---|
| MR. BENFORD: | There's a general charge of the Court.  I've seen that in the Court's general charge on filing inconsistent statements.  To single this one witness out, I believe, is an improper thing to do and I think it would add to -- |
| THE COURT: | To be quite candid with you, I'm afraid not to do it. I'm afraid not to do it. * * * Well, now.  I've got an instruction here called State's Instruction No. 1, and I'm going to offer it, but I want you to put your objections to that on the record right now, detailed as you want to do it.  You can put them on the record right now.  That's why we're here.  You've got a copy of it in front of you, haven't you, Mr. Benford? |
| MR. BENFORD: | Yes, Your Honor.  If I may, I'll write those on it and file that -- |
| THE COURT: | I don't have any illusion that that will be done, but you can do it sometime before the jury verdict comes back.  But I note your objection to the instruction being offered, but I'm afraid not to offer the instructions on it.  I've got a bad feeling about that. Also, I read your case here.  What else have we got. |

(ECF No. 12, Ex. 34 at 226-228).  The specific objections made by defense counsel are

not a part of the record before the court.

Nevertheless, in reviewing the instructions that were actually read to the jury, the

undersigned has determined that the jury was instructed as follows concerning the prior

statement of witness Connie Nichols:

> The statement of the witness, Connie Nichols, dated November 24, 1989, and given by her to Sgt. H.M. Eads, should be considered by you, insofar as and only insofar as, the contents of this statement may bear upon the credibility of the witness Connie Nichols, and the contents of this statement should not be considered by the jury as evidence of the guilt or innocence of the accused.

(ECF No. 12, Ex. 35 at 60). As explained in greater detail in the analysis of Ground 6 of the petitioner's Amended Petition, *infra*, this is not an incorrect pronouncement of law, as the Nichols statement was hearsay, and did not meet any of the hearsay exceptions which would have allowed it to be considered as evidence in the case, rather than only for impeachment or credibility purposes. Accordingly, the petitioner has not demonstrated that there was any prejudicial error in the giving of this instruction.

The petitioner raised these claims only in his direct appeal, which was summarily refused. A review of the instructions given to the jury, taken as a whole, in the context of the evidence presented at trial, including the instructions concerning impeachment and corroboration of witness testimony, were not found to be erroneous by the SCAWV. The undersigned proposes that the presiding District Judge **FIND** that the petitioner has not sufficiently demonstrated that the instructions given at his trial fundamentally impugned the fairness thereof. Accordingly, the petitioner has not established that the state court's decision denying him relief on this basis was contrary to, or an unreasonable application of, clearly established federal law. Therefore, the undersigned further proposes that the presiding District Judge **FIND** that the respondent is entitled to judgment as a matter of law on Ground 4 of his Amended Petition.

     **E.**    **Ground 5 – Special prosecutor's status.**

In Ground 5 of his Amended Petition, the petitioner contends that he was denied a fair trial on the basis that Thomas C. Evans, III, who was appointed as a special

prosecutor in his case was not properly appointed because he took the oath of office before the Circuit Clerk prior to his appointment order being entered by the Circuit Court. (ECF No. 24 at 14). His Amended Petition specifically states:

1. Under West Virginia law, if the prosecuting attorney of Roane County, WV, was unable to act, or if in the opinion of the court would be improper for him to act, the Circuit Court of Roane County shall appoint some competent practicing attorney to act in that case. *W. Va. Code § 7-7-8* (1987 c. 35).

2. In 1989, the duly elected prosecuting attorney of Roane County, WV, was unable to act, or if [sic] in the opinion of the court it would be improper for him to act.

3. On October 3, 1991, the State orally moved for appointment of a special prosecutor.

4. Before a prosecuting attorney may be disqualified from acting in a particular case and relieved of the duties imposed upon him by the Constitution and by statute, the reasons for his disqualification must appear on the record. Syl. Pt. 3, *State ex rel. Preissler v. Dostert*, 163 W. Va. 719, 260 S.E.2d 279 (1979).

5. Under West Virginia law, an appointment of a special prosecutor must be narrowly drawn, and an order purporting to appoint a special prosecutor to present petitioner's case to the grand jury may be void *ab initio* because it did not by its terms limit the prosecutorial discretion of the appointee. *State ex rel. Brown v. Mayfield*, 182 W. Va. 519, 389 S.E.2d 484, 487 (1990).

6. On October 10, 1991, Thomas C. Evans, III, took the oath of office prior to his appointment as special prosecutor on October 11, 1991.

7. On October 11, 1991, the Circuit Court of Roane County, WV, appointed Thomas C. Evans, III as Special Assistant Prosecuting Attorney.

8. Under state law, every person appointed to any office in this state, before proceeding to exercise the authority or discharge the duties of such office, shall take the oath or affirmation prescribed by Article IV, § 5 of the Constitution of West Virginia. *W. Va. Code* § 6-1-3 (Cide 1923, c. 9, §§ 1, 22; c. 10).

9. Thomas C. Evans, III, did not take the oath of office after his appointment as special prosecutor.

> Therefore, petitioner was denied due process of law as secured by the Fifth and Fourteenth Amendments to the Constitution of the U.S.A., as Thomas C. Evans, III, was not duly sworn special prosecutor when he participated in petitioner's case in 1989-1990.

(ECF No. 24 at 14-15).

The respondent contends that this is not a cognizable federal claim and further asserts that, ultimately, the petitioner cannot demonstrate a true violation of W. Va. Code § 6-1-3, which mandates that "every person . . . appointed to any office in this state, before proceeding to exercise the authority or discharge the duties of such office, shall take the oath or affirmation . . . ."  Essentially, it appears that the respondent is asserting that, even if Mr. Evans took the oath before his appointment order was actually entered by the court, it did not result in an infringement of the petitioner's constitutional rights because both requirements were met prior to Mr. Evans exercising any authority or discharging any duties in the petitioner's case.  (ECF No. 32 at 27).

The petitioner's Response only asserts that this federal court already found this claim to contain a cognizable federal constitutional claim that was exhausted through the petitioner's direct appeal.  (ECF No. 38 at 33).  He does not provide any additional authority or argument on the merits of this claim.  Nor does the respondent's Reply expand on this claim.  (ECF No. 40).

In order to find a due process violation, the court must find that the appointment of the special prosecutor involved circumstances that impugned the fundamental fairness of the petitioner's trial.  The petitioner has not offered any support for such a finding beyond his bald assertion that Mr. Evans took the oath prior to the order appointing him actually being entered into the record.

The undersigned proposes that the presiding District Judge **FIND** that the petitioner has not sufficiently demonstrated that the circumstances surrounding the appointment of Thomas C. Evans, III, as a special prosecutor in the petitioner's criminal case violated his rights to due process and a fair trial.  Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state court's decision denying the petitioner relief on this claim was neither legally or factually unreasonable, and that the respondent is entitled to judgment as a matter of law on Ground 5 of the petitioner's Amended Petition.

### F.        Ground 6 - Denial of Confrontation Rights.

In Ground 6 of his Amended Petition, the petitioner asserts that he was denied effective confrontation and full cross-examination of two of the State's primary witnesses, Melinda Stewart and Connie Nichols.   (ECF No. 24 at 16).   Concerning Melinda Stewart, the petitioner claims that, when defense counsel was questioning Stewart about the sequence of events immediately prior to the shootings, the trial judge stopped the inquiry.   The petitioner cites to Trial Transcript Volume III, October 17, 1991 (ECF No. 12, Ex. 34) at 60-61.   Defense counsel's questions were directed at whether Stewart thought there was going to be a fight between the petitioner and Charles (Chuck) Tanner.  The following colloquy ensued:

[BY MR. BENFORD:]

Q.      What my question was, it was right after you had heard and seen
        your sister, Connie, cussing Chuck that Chuck came over to the
        table and told you, "Did you see that?  Harper hit me."

A.      Yeah.

Q.      You didn't see him hit him --

A.      No.

Q.      -- but that -- okay.  You told Chuck to calm down or something to that effect.

A.      Yeah.

Q.      And Chuck was getting kind of loud about it, wasn't he?

A.      He was at first.

Q.      You told him to calm down.  So it appeared to you there was about to be a fight.  Isn't that right?

A.      Well, I don't know.  It was just a reaction.  I mean --

Q.      Didn't you think there was about to be a fight?

A.      Well, I didn't want one.  I mean there wasn't nothing there then they were.

Q.      I understand you didn't want one and you were –

MR. EVANS:          She answered the question.  Didn't she, Your Honor?

THE COURT:          I'm not certain.

BY MR. BENFORD:

Q.      It appeared that there was about to be a fight and you were trying to keep a fight from starting, isn't that right?

MR. EVANS:          She's answered this question, Your Honor.

THE COURT:          Just a minute.  Now, ma'am, can you answer that?

A.      Okay.  What I said was whenever Chuck come over there and said that Roger had hit him, I told him to calm down because I didn't want it all getting blown out of proportion.  I figured that I'd calm Chuck down and there wouldn't be no more trouble.

THE COURT:          Go to something else.

MR. BENFORD:       If I may ask just one follow-up to that, Your Honor.

THE COURT:          Anything other than did she think there was going to be a fight.

MR. BENFORD: I won't ask that.

BY MR. BENFORD:

Q. It was then that Chuck kept talking about it and his voice got louder, is that right?

THE COURT: It's been asked and answered.

MR. BENFORD: The sequence, Your Honor, is what I'm --

THE COURT: It's been asked and answered.

MR. BENFORD: Is the witness permitted to answer the question?

THE COURT: No.  I've ruled.

* * *

THE COURT: The record reflects there was no objection.  Go ahead.

(ECF No. 12, Ex. 34 at 60-62).

Based upon this colloquy, the petitioner contends that the trial court denied him the opportunity to fully cross-examine Stewart in violation of his right "to be confronted with the witnesses against him" as guaranteed by the Sixth Amendment.

The respondent's Memorandum of Law in support of his Motion for Summary Judgment asserts that the petitioner "received the privilege" of confronting all of the witnesses against him.  (ECF No. 32 at 27).  The Memorandum of Law further states:

> With regards to his claim involving Stewart, the court made a *sua sponte* order that a question be deemed asked and answered.  The Petitioner's counsel had thrice asked Stewart about whether she believed there was going to be a fight between Petitioner and Charles Tanner, one of the victims, on the night of the murders.  (Resp't's Ex. 34 at 61-63.)  Stewart responded in same after each question, that she did not know if there was going to be a fight, and that she was trying to diffuse any tension resulting from Petitioner hitting Tanner.  (*Id.*)  After counsel for the Petitioner had asked the same question twice, the State commented that she had already answered the question.  (*Id.* at 61).  The Court gave the benefit of the doubt to the Petitioner, letting counsel for the Petitioner ask the question once more, and instructing Stewart to fully answer.  (*Id.*)  Following Stewart's

> full answer to the question posed on cross-examination, counsel for the
> Petitioner, unhappy with Stewart's answer, asked the same question a
> third time.  (*Id.*)  At this point, the Court *sua sponte* deemed the question
> to have been asked and answered.  (*Id.* at 62).  Thus, since the Petitioner
> was effectively able to cross-examine Stewart, no violation of his
> constitutional rights occurred.

(*Id.* at 27-28).

The petitioner's Response adds no new argument or information concerning this claim.  (ECF No. 38 at 33-34).

In *Pointer v. Texas*, 380 U.S. 400, 403 (1965), the Supreme Court held that the "right of an accused to confront the witnesses against him is likewise a fundamental right and is made obligatory on the States by the Fourteenth Amendment."  The court further held that this right includes the right to cross-examine those witnesses.  *Id.*

In *Turner v. Louisiana*, 379 U.S. 466, 472-473 (1965), the Court held that "[i]n the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel."  The Court further stated that "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested."  *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  However, the Court added that this right is "[s]ubject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation . . . ."  (*Id.*)

Although the court stopped defense counsel's repetitive questioning concerning Stewart's opinion of whether there was going to be a fight between the petitioner and Chuck Tanner, the petitioner was nonetheless able to establish that theory during Stewart's cross-examination.  The petitioner has not offered any additional support for

his contention that he was denied the right to confront Stewart. This claim was summarily refused by the SCAWV on direct appeal. The undersigned proposes that the presiding District Judge **FIND** that the state court's denial of relief on this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, and that the respondent is entitled to judgment as a matter of law on this claim.

Turning to the second assertion in Ground 6, the petitioner contends that he was denied the right to effectively cross-examine Connie Nichols because he was not permitted to inquire about a prior inconsistent out of court statement Nichols made to the police. The petitioner's Amended Petition states:

> 4. Connie Nichols was present in the barroom where the shootings occurred.
>
> 5. Defense counsel cross-examined Connie Nichols, a prosecution witness, regarding a prior inconsistent statement she had given to the investigating officer.
>
> 6. The Trial Court read Connie Nichols' statement to the jury, but the trial judge did not allow defense counsel to question the witness as to the truth of the statements. _State v. Harper_, Circuit Court of Roane County, 10-17-91, pp. 24-35.
>
> 7. Defense counsel was not allowed to inquire about the prior inconsistent statement which went to the question of whether a 2nd degree murder under heat of passion occurred.

(ECF No. 24 at 16).

Connie Nichols was dancing with the petitioner at the time of this incident. On cross-examination, Nichols was asked about a statement she made to the investigating officers. When asked if she had told the police that the petitioner "freaked out," she stated that she did not remember whether she made that statement. (ECF No. 12, Ex. 34 at 24). Thus, defense counsel attempted to refresh Nichols' recollection by showing her the written statement, which was marked as Defendant's Exhibit No. 5. (_Id._ at 25-27).

Even upon reading the statement, Nichols still stated that it did not refresh her recollection. (*Id.* at 27). Defense counsel persisted in asking Nichols to read the statement to herself and his questions appear to confuse what may have transpired at the moment that Tanner tapped the petitioner on the shoulder with what may have happened after Tanner went back to the table, and the State objected and moved that the entire statement be read to the jury. The trial court agreed. Thus, the entire statement was read on the record by the trial court. (*Id.* at 33-34). The statement read as follows:

> About 6:00 p.m., this evening, I met John Channels and Ivan Wise at the Malibu Club in Spencer. I drank a beer there and they had two a piece while I was there. We left there and went down to the Bargain Basement. I went in there and I was with Johnny Channels and Ivan Wise.
>
> Chuck Tanner and a guy named Dewey was already in there. Roger Harper and Melinda Stewart came in there a little later. In the course of the evening, I was dancing with Roger Harper. Chuck Tanner was headed for the bathroom and he pecked Roger on the back.
>
> He didn't say anything to Roger. Roger freaked out and was going to punch Chuck. I broke that up. Ivan hollered at Chuck and he went over to see what he wanted. Chuck said something and Roger freaked out. He pulled a pistol from his back pocket. He shot Chuck, Johnny. And Ivan Wise ran out of the place of business.
>
> Jonny fell first, Roger Harper ran out after Ivan. Melinda ran after them. I didn't see Roger anymore after that. Roger carried a little pistol in his back pocket and a pistol in his glove-box. Before he did this, he told me that he had had enough. None of the other guys had any kind of weapon. They were minding their own business when Roger shot them.

(*Id.*) Defense counsel then asked Nichols if her statement right after the incident would be more accurate than her current memory and she said no. (*Id.* at 34-35).

After much debate outside the presence of the concerning whether the out-of-court statement, which was not made under oath, could be considered an exception to

hearsay and be considered as evidence by the jury, the court concluded it was not and

gave the following instruction to the jury:

> During the testimony of Connie Nichols, the Court read to the jury a statement made to H.M. Eads by Connie Nichols. The jury is instructed that no special consideration is to be given to this statement, solely for the reason that it was read to you by the Court.

(*Id.* at 84-85). Ultimately, in the final instructions, the court also gave the following

limiting instruction:

> The statement of the witness, Connie Nichols, dated November 24, 1989, and given by her to Sgt. H.M. Eads, should be considered by you, insofar as and only insofar as, the contents of this statement may bear upon the credibility of the witness Connie Nichols, and the contents of this statement should not be considered by the jury as evidence of the guilt or innocence of the accused.

(ECF No. 12, Ex. 35 at 60).[8]

The respondent's Memorandum of Law asserts:

> As indicated by the trial transcript, Nichols clearly did not remember her prior police statement as it was related to the defense counsel's questioning. (Resp't's Ex. 34 at 24-35). Similarly, Nichols seems to be confused as to whether she was being questioned regarding a statement made *after* the shoulder-tapping incident. (*Id.*) Defense counsel makes it known to the Court that the police statement is being used for purposes of refreshing Nichols['] recollection of the events in question. (*Id.* at 27). As such, the Court, while following the rules of evidence, read the statement in full to the jury, and into the record, but did not admit it into evidence. (*Id.* at 33-34). Afterwards, defense counsel questioned Nichols regarding minor inconsistencies between her prior statement and her current testimony. (*Id.* at 35-36).
>
> In sum, while Petitioner indicates that the Court failed to provide him with a meaningful opportunity to confront Stewart and Nichols as witnesses against him, the actual transcript indicates that the Court provided numerous and ample opportunity to defense counsel to conduct meaningful cross-examination. Further, the trial transcript indicates that defense counsel was effectively able to cross-examine Stewart about the instances prior to the murders and Nichols about her prior statement,

---

[8] As noted in the section addressing Ground 4 above, this instruction was a correct statement of the law under the circumstances.

proving that Petitioner's claims are not only false, but opposite of what actually transpired. Consequently, ground six (6) of the Petitioner's claim must be summarily dismissed as a matter of law, as there was no violation of the Petitioner's constitutional rights.

(ECF No. 32 at 28-29).

The petitioner's Response adds no new information or argument concerning this claim. He merely repeats his allegations that the defense was not allowed to inquire about Nichols' prior inconsistent statement and claims that he was denied evidence to support a finding of second degree murder. (ECF No. 38 at 33-34).

The undersigned proposes that the presiding District Judge **FIND** that the petitioner has not demonstrated that he was unconstitutionally denied the right to fully and effectively confront either Stewart or Nichols as State witnesses at his trial. Moreover, the petitioner has not demonstrated that the limitation of cross-examination of either Stewart or Nichols has a substantial and injurious effect or influence on the jury's verdict. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state court's decision denying the petitioner relief on this basis was neither contrary to, nor an unreasonable application of, clearly established federal law, and that the respondent is entitled to judgment as a matter of law on Ground 6 of the petitioner's Amended Petition.

### G.   Ground 7 – Denied right to present exculpatory statements.

In Ground 7 of his Amended Petition, the petitioner contends that he was denied the right to a fair trial when the trial court refused to allow the defense to introduce the testimony of Sgt. H.M. Eads concerning a statement that he took from the petitioner on the morning of his arrest, and refused to admit Defendant's Exhibit No. 4, which is the waiver of rights sheet containing Sgt. Eads' notes concerning the plaintiff's recollection

of the events (or lack thereof).   (ECF No. 24 at 17).   The petitioner contends that the statement contains exculpatory statements to the effect that it corroborates his assertion that he does not remember anything about the shootings, and would have countered the State's argument of fabrication.  (*Id.*)

The petitioner further contends that "the trial court erred in refusing to allow the defendant to testify on direct examination the events surrounding the shooting in this case is not a defense to the charges inasmuch as such knowledge goes to the credibility of the defendant as a witness on his own behalf."  (*Id.*)   The petitioner also alleges the following supporting facts:

1. On the morning after the shooting, Sgt. [Eads] asked petitioner if he had a pistol.  Petitioner replied that he has a .22 caliber, 5-shot revolver.

2. Sgt. [Eads] testified that he asked petitioner about what happened at the Basement Bar.  Petitioner replied that someone tapped him on the shoulder and that's all that he remembered.

3. Sgt. [Eads] asked petitioner what he had done after the shootings and before he called Sgt. [Eads].  Petitioner told Sgt. [Eads] that he guessed he had driven around all night.

4. Sgt. [Eads] asked petitioner where's the pistol.  Petitioner replied that the pistol was gone and he didn't know what happened to the pistol.  *State v. Harper*, Trial Transcript, October 6, 16, 1991, pp. 175-178.

5. The trial court refused to allow petitioner to introduce the testimony of H.M. [Eads], Sergeant, W. Va. Dept. of Public Safety, as to the statements petitioner made to Sgt. [Eads] at the State Police Barracks.

6. After the prosecuting attorney objected, an *in camera* hearing was convened.  See, *State v. Harper*, Trial Transcript, October 16, 1991, pp. 131-161.

   A. The state objected to the introduction of the oral statements taken and recorded by Sgt. [Eads] after he had mirandized petitioner as hearsay.

    B.  The defense contended the statements were admissible as alternative statements against interest or party admission[s] under Rule 801(d)(2)(a).

    C.  The Court ruled the statements inadmissible and directed the jury to disregard the prior testimony.

  7.  The trial court refused to admit Defendant's Exhibit # 4 which is the Rights' Sheet completed by Sgt. [Eads] at the time petitioner made his statements.

  8.  The trial court refused to allow petitioner to testify during direct examination that he did not remember the events surrounding the shootings in this case.

  9.  The prosecuting attorney improperly brought forward a loss of memory and fabrication argument against petitioner which petitioner [sic] while petitioner was not allowed to introduce evidence on  this issue.

  10.  See, *State v. Harper*, Trial Transcript, October 16, 1991, pp. 132-161, 169-170, 175-178.

(ECF No. 24 at 17-18).

  The respondent's Memorandum of Law in support of his Motion for Summary Judgment contends that the defense was attempting to have this statement admitted under Rule 804(b)(3), which states:

  A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless he or she believed it to be true.  A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Rule 804(b)(3).  (ECF No. 32 at 29).  The respondent further contends, however, that this hearsay exception only applies if the declarant is unavailable to testify, or for

inculpatory purposes if the defendant in a criminal matter chooses to testify.  (*Id.*)  The

Memorandum of Law further asserts:

> Here, the court, in applying W. Va. R. Evid. 804(b)(3), makes note
> that, while defense counsel is attempting to introduce a facially-
> inculpatory statement, its purpose for doing so is in the interest of
> bolstering a claim that medical experts had already prevented the
> Petitioner from validly asserting, that he had "blacked out" as a result of
> IED.  Further, the Petitioner was available and had already made known
> that he would testify in his own defense.  The court, realizing that the
> statement was actually being used for *exculpatory* reasons which clearly
> made the statement inadmissible hearsay under the Rules of Evidence,
> ordered that such statement would not reach the ears of the jury.  The fact
> that the hearing on the matter itself was conducted outside of the purview
> of the jury was proper.
>
> As a result, the Petitioner's argument that the court's failure to rule
> the statement was admissible amounted to a constitutional due process
> violation is incorrect as it runs counter to the established rules of evidence.
> Therefore, there is no constitutional error and ground seven (7) must be
> summarily dismissed as a matter of law.

(*Id.* at 29-30).

The petitioner's Response largely repeats the assertions he made in his petition.

(ECF No. 38).  His Response further states:

> The Court ruled the statements inadmissible and directed the jury to
> disregard the prior testimony.  The judge refused to admit Defendant's
> Exhibit # 4 which is the Rights Waiver Sheet completed by Sgt. [Eads].
> The judge refused to allow petitioner to testify during direct examination
> that he did not remember the events surrounding the shootings.  And Mr.
> Evans improperly brought forward a loss of memory and fabrication
> argument against petitioner while the petitioner was not allowed to
> introduce evidence on this issue.  See, *State v. Harper*, Trial Transcript,
> 10-16-91, pp. 132-161, 169-170, 175-178.

(ECF No. 38 at 35-36).

The petitioner's statement to Sgt. Eads was hearsay, because it was an out of

court statement, which was not made under oath, and which was essentially being

offered by the petitioner for the truth of the matter asserted.  The petitioner has not

properly established that this statement was admissible under any exception to the hearsay rule. Nor has he demonstrated that the failure to get this statement admitted resulted in any undue prejudice to his defense. The undersigned further proposes that the presiding District Judge **FIND** that the state court's decision denying the petitioner relief on this basis was neither contrary to, nor an unreasonable application of, clearly established federal law, and that the respondent is entitled to judgment as a matter of law on Ground 7 of the petitioner's Amended Petition.

### H.    Ground 8 – Improper remarks by prosecutor.

In Ground 8 of his Amended Petition, the petitioner contends that he was denied the right to a fair and impartial jury trial because the prosecuting attorney allegedly made improper remarks during his closing and rebuttal arguments to the jury. Specifically, the petitioner contends that the following four statements by the prosecutor were unduly prejudicial:

1.    "He executed John [Channels], Jr.

2.    "I submit to you some barnyard justice would tell you, what's good for the goose is good for the gander."

3.    "You decide what kind of law enforcement we're going to have."

4.    "You decide whether or not we're going to let people up and just brutally gun down in a brutal and savage manner to [sic; two?] people."

*State v. Harper*, Trial Transcript, 10-18-91 [ECF No. 35], p. 115. (ECF No. 24 at 19). The petitioner's Amended Petition does not elaborate on this claim.

The respondent's Memorandum of Law in support of his Motion for Summary Judgment addressed this claim as follows:

> In ground eight (8) of the Amended Petition, the Petitioner contends that he suffered a violation of his due process rights as a result of

the prosecutor's statements making the trial fundamentally unfair. The Respondent contends that the Petitioner has not provided a basis for such a claim, and that such basis, is, in fact, nonexistent. Regardless, the Respondent also asserts that the Petitioner's argument fails as a matter of law.

In *Humphries v. Ozmint*, 397 F.3d 206, 218 (4th Cir. 2005), the Fourth Circuit provided the [sic] that "a prosecutorial misconduct determination requires the court to look at the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the court's charge, and whether the errors were isolated or repeated." (citing *Boyd v. French*, 147 F.3d 319, 329 (4th Cir. 1998)).

Here, the statements of the prosecuting attorney, that (1) "[Petitioner] executed John Cannels [sic; Channels] Jr.," (2) "I submit to you [sic] some barnyard justice would tell you, what's good for the goose is good for the gander," (3) "You decide what kind of law enforcement we're going to have," and (4) "You decide whether or not we're going to let people up and just brutally gun down in a brutal and savage manner to [sic; two] people" were plainly just the type of adversarial arguments made on a regular basis during closing comments. Further, the closing comments fell within the prosecutor's theory of guilt and were insurmountably bolstered by the amount and quality of evidence submitted to the jury. In fact, the Petitioner himself admitted to both murders and the malicious wounding.

As a result, the Petitioner's claim that prosecutorial misconduct occurred to the extent necessary to warrant habeas relief under due process rights is incorrect and should be summarily dismissed as a matter of law.

(ECF No. 32 at 30-31).

The petitioner's Response asserts that a prosecutor has a "duty to refrain from improper methods calculated to produce a wrongful conviction." *Viereck v. U.S.*, 318 U.S. 236, 248 (1943). (ECF No. 38 at 37). The petitioner contends that Mr. Evans' comments crossed that line. His Response further states:

Prosecuting attorneys are not allowed to incite the jurors' passions by suggesting that they act as the community's conscience to society's problem. *U.S. v. Rogers*, 556 F.3d 1130, 1143 (10th Cir. 2009). "A prosecutor may not urge jurors to convict a defendant in order to protect community values, preserve civil order or deter future lawbreaking." *U.S. v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir. 2005). The Court did not

> ameliorate Prosecutor Evans' improper civic duty argument which encouraged jurors to convict this defendant in order to protect their wives, husbands, children, and neighbors, by admonishing the jurors that they must not let sympathy or prejudice influence their decision.   "It is improper for a prosecutor to suggest that a jury has a civic duty to convict."   *Thornburg v. Mullin*, 422 F.3d 1113, 1134 (10th Cir. 2005). Prosecutors cannot imply that jurors should convict a defendant because failure to do so would endanger their neighbors.  *U.S. v. Johnson*, 231 F.3d 43, 47 (D.C. Cir. 2000); *Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991).

(*Id.* at 37-38).  The petitioner further contends that "[t]he jury's decision to impose a life sentence without a recommendation of mercy must be 'based on reason rather than caprice or emotion.'"  *Gardner v. Florida*, 430 U.S. 349, 358 (1977).  The petitioner contends that the prosecutor's statements in his case shifted the emphasis to the jury's emotion.  (*Id.* at 38).

Habeas relief is only warranted if a prosecutor's remarks rendered the trial fundamentally unfair.  The United States Supreme Court has held that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether prosecutor's conduct affected fairness of the trial." *United States v. Young*, 470 U.S. 1, 11 (1985).  "Prosecutorial misconduct may warrant habeas relief only if the relevant misstatements were so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process deprivation." *Caldwell v. Russell*, 181 F.3d 731, 736 (6th Cir. 1999) (citations omitted), *abrogated on other grounds*, *Mackey v. Dutton*, 217 F.3d 399, 406 (6th Cir. 2000); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting

conviction a denial of due process'") (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

Given that the evidence was sufficient to find the petitioner guilty of the crimes with which he was charged and viewing the argument in the context of the entire proceedings, such comments did not infect the trial with unfairness or deny the petitioner due process.  *See Buell v. Mitchell*, 274 F.3d 337, 364-65 (6th Cir. 2001); *Kinder v. Bowersox*, 272 F.3d 532 (8th Cir. 2001); *Sublett v. Dormire*, 217 F.3d 598 (8th Cir. 2000); *United States v. Sanchez-Sotelo*, 8 F.3d 202, 211 (5th Cir. 1993); *Simmons v. Bowersox*, 235 F.3d 1124, 1136-37 (8th Cir. 2001).

For these reasons, the undersigned proposes that the presiding District Judge **FIND** that the petitioner's rights to due process and a fair trial were not violated by the prosecutor's comments in closing argument.   The court further proposes that the presiding District Judge **FIND** that the failure to grant the petitioner post-conviction relief on this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, or based upon an unreasonable determination of the facts as set forth in the record, and that the respondent is entitled to judgment as a matter of law on Ground 8 of the Amended Petition.

## I.    Ground 9 – Cumulative error.

In Ground 9 of his Amended Petition, the petitioner contends that "[t]here were numerous errors and violations of the fundamental rules of law and evidence that considered cumulatively denied defendants a fair trial."   (ECF No. 24 at 20).   His Amended Petition further states:

> 1.    Prior to petitioner's trial, the Supreme Court had clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial

fundamentally unfair.  *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973).

2.  Prior to petitioner's trial, the U.S. Supreme Court has determined the cumulative error analysis must focus on the underlying fairness of the trial.  *Delaware v. Van Arsdall*, 475 U.S. 673, 691 89 L. Ed.2d 674, 106 S. Ct. 1431 (1980).

3.  Petitioner's direct petition for appeal identified twenty-one errors and fundamental rules of law and evidence that, considered cumulatively, denied petitioner a fair trial even if each individual error was not considered in and of itself to be reversible error.

(*Id.* at 21).  The petitioner further asserts that the federal court must determine whether "the aggregated errors 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  (*Id.*)

The respondent's Memorandum of Law in support of his Motion for Summary Judgment asserts that the petitioner has failed to present any cognizable claim of error to support habeas corpus relief based upon cumulative error.  (ECF No. 32 at 21).

In *Fisher v. Angeleone*, 163 F.3d 835, 852 (4th Cir. 1998), the Fourth Circuit held that "legitimate cumulative-error analysis evaluates only the effect of matters <u>actually determined to be constitutional error</u> . . . ." [Emphasis added].  Thus, in order for a cumulative error analysis to apply, the court must first find that there have been actual constitutional errors.

The petitioner's claim of cumulative error stems from claims which the court has previously found to be non-errors.  Because the court has already found that there were no violations of the petitioner's constitutional rights, to the extent that the petitioner raises (as a basis for cumulative error) claims already addressed by the court, his claim of cumulative error lack merit as well.

The undersigned proposes that the presiding District Judge **FIND** that the petitioner was not denied a fair and impartial trial based on the cumulative effect of any alleged errors asserted by him in his federal petition, and that the state courts' decisions denying the petitioner post-conviction relief were not legally or factually unreasonable. Therefore, the undersigned further proposes that the presiding District Judge **FIND** that the respondent is entitled to judgment as a matter of law on Ground 9 of the petitioner's section 2254 petition.

## RECOMMENDATION

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the respondent's Motion for Summary Judgment, including the incorporated Motion to Dismiss as to Grounds 2(a), 2(b), 2(c), 2(e), 2(f), 2(g), 2(h), 2(i), 2(j) and 3 (ECF No. 31), **DENY** the petitioner's Motion to Deny Respondent's Motion to Dismiss pursuant to Rule 12(b)(6) (ECF No. 34), and dismiss this matter from the docket of the court.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the district court and a waiver of appellate review by the circuit court of appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy of the same to Petitioner, and to transmit it to counsel of record.

 February 19, 2015

Dwane L. Tinsley
United States Magistrate Judge